**Andre BROWN, Petitioner–Appellee,**

v.

**Robert KUHLMANN, Superintendent of Sullivan Correctional Facility, Respondent–Appellant.**

**No. 426, Docket 97–2189.**

United States Court of Appeals, Second Circuit.

Argued Aug. 28, 1997.

Decided April 24, 1998.

As Amended June 1, 1998.

Marc Frazier Scholl, Assistant District Attorney, New York County (Robert M. Morgenthau, District Attorney and Mark Dwyer, Assistant District Attorney, on the brief), for Respondent–Appellant.

Richard M. Greenberg, Office of the Appellate Defender, New York City (Rosemary Herbert, David Blair–Loy, on the brief), for Petitioner-Appellee.

Before: MESKILL and JACOBS, Circuit Judges, and KORMAN, District Judge.*

KORMAN, District Judge:

Andre Brown was convicted of participating in the kidnapping of Isidro Sanchez, a 21 year-old emigre from the Dominican Republic. Sanchez was held for twelve hours during which he was kept blindfolded and beaten. Before he was rescued by the Emergency Services Unit of the New York City Police Department, ransom telephone demands were made to his family by the kidnappers. Some of these demands were recorded by the police, who had been called by the Sanchez family. Brown was identified by Isidro Sanchez as the principal perpetrator, and Brown's voice on the recorded conversations was identified by Isidro Sanchez and his brother, Raimundo Sanchez. Andre Brown was not found in the apartment at the time Isidro Sanchez was rescued because he was on the way to meet Raimundo Sanchez to pick up ransom money. Nevertheless, the compelling evidence of Brown's complicity was corroborated by his stop for a traffic infraction while driving outside the apartment where Sanchez was held captive a little more than three hours before Sanchez was rescued.

* Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

Brown offered no evidence on his own behalf—not even one of his friends or family members who were present at the trial—to testify that his was not the voice on the tape recorded telephone conversations with the Sanchez family. The evidence of guilt was thus "unanswered—and unanswerable." *United States v. Hasting,* 461 U.S. 499, 512, 103 S.Ct. 1974, 1982, 76 L.Ed.2d 96 (1983). Indeed, Brown's only argument on direct appeal was that his conviction should be reversed because the public was excluded from the courtroom during the testimony of a New York City Police Officer that occupies less than six pages of a transcript of over nine hundred pages and provides cumulative evidence with respect to a collateral issue in the case.

After this argument was rejected by the Appellate Division because it was "not preserved for appellate review," *People v. Brown,* 216 A.D.2d 100, 101, 627 N.Y.S.2d 925 (1st Dept.1995), and leave to appeal to the Court of Appeals was denied, *People v. Brown,* 86 N.Y.2d 872, 635 N.Y.S.2d 953, 659 N.E.2d 776 (1995), Brown filed a petition for a writ of habeas corpus seeking relief on the ground that he unsuccessfully argued on direct appeal. The petition was granted by the United States District Court for the Southern District of New York. *Brown v. Kuhlmann,* No. 96 CIV 7530(HB), 1997 WL 104956 (S.D.N.Y. Mar. 10, 1997) (Baer, J.). On this appeal by the State of New York (in the person of the Superintendent of the Sullivan County Correctional Facility), we hold that the brief courtroom closure did not violate the Public Trial Clause and, even if the closure was not justified, it does not warrant habeas corpus relief.

### BACKGROUND

Isidro Sanchez, who was born in the Dominican Republic, arrived in New York with his family in 1984 and was a legal resident of the United States. When he was seventeen years old, Sanchez was involved in two fights and, as a result, was jailed in March of 1989. While in jail, Sanchez became friends with Andre Brown and another man, who was known to him only as "Dubo." Sanchez saw Brown every day in prison for about four months, and the two made plans to remain friends after their respective releases. During their prison conversations, Sanchez bragged to Brown that he could get drugs.

In March 1990, after his release from prison, Sanchez was arrested while in possession of a kilogram of cocaine. He was convicted of felony drug possession and sentenced to an indeterminate prison term of one to three years. In March 1991, Sanchez was released from jail. Over the next few months, he met with Brown several times at a bar at the corner of Broadway and 143rd Street in Manhattan. On the night of June 29, 1991, Brown contacted Sanchez and arranged a meeting. At about 11:00 p.m. that night, Sanchez met Brown at the corner of 143rd Street and Broadway and then walked with him along 143rd Street towards Riverside Drive. When the two stopped to talk, Dubo approached Sanchez from behind, held a pistol to his head, and forced him into a car. Sanchez was then handcuffed, blindfolded, warned not to scream or make any noise, and told to get down in the backseat so that no one could see him.

After a forty-five minute ride the kidnappers led Sanchez into an apartment located in the Breukelen Housing Project at 716 East 108th Street, between Glenwood Road and Flatlands Avenue in Brooklyn. There they began making a series of telephone ransom calls to Sanchez's family demanding money and drugs. Isidro's brother, Raimundo Sanchez, his sister, Maria Magdelena Sanchez, and his mother, Dulce Sanchez, were all home that morning and received the first ransom call at about 2:00 a.m. The kidnappers told the family to deliver $15,000 and a kilogram of cocaine to a certain location or else Isidro would be killed. The kidnappers made several similar calls to Isidro's family. During one call, Brown identified himself to Raimundo Sanchez and threatened to kill both Isidro's girlfriend and Raimundo unless the ransom demands were met. Ultimately, the Sanchez family notified the police. At about 5:40 a.m., Detective Roman Rosario arrived at the Sanchez apartment in Manhattan with tape recording equipment. Subsequent ransom calls were recorded by Detective Rosario, who also

spoke with the kidnappers himself, posing as the Sanchez's Uncle Marco.

Meanwhile, Isidro Sanchez remained handcuffed and blindfolded in the Brooklyn apartment to which he had been taken. After about two hours of captivity, his captors began beating him "[o]n the head, all over" with a metal object that he believed was a pistol. He was also burned with a cigarette lighter about his face and neck, on his torso, and on his legs. Raimundo Sanchez could hear his brother screaming during some of the telephone calls. At approximately 10:00 a.m. on June 30, 1991, an incoming call from the kidnappers to the Sanchez apartment was traced to 716 East 108th Street, Apartment 1D in the Breukelen Housing Project. At about 1:05 p.m., an Emergency Services unit entered that apartment and found Isidro, still handcuffed and blindfolded. The apartment's four occupants, including one Joshua Simon, were arrested. Brown was not in the apartment when the police entered because he had left to pick up ransom money from Raimundo Sanchez.

The evidence implicating Andre Brown in the kidnapping included Isidro Sanchez's testimony identifying him as one of the men who had abducted him and then restrained him in the Brooklyn apartment. Isidro Sanchez also identified Brown as one of the kidnappers who spoke to his family on the taped ransom calls. Raimundo Sanchez testified that one of the kidnappers with whom he spoke on the phone identified himself as "Andre." There was also evidence that a car driven by Brown was stopped by two police officers in the immediate vicinity of the Breukelen Housing Project on the morning of June 30, 1991, a little more than three hours before Isidro Sanchez was rescued. Specifically, at about 9:40 a.m., uniformed police officers, who were patrolling in a marked police car, observed a vehicle driven by Brown committing a traffic infraction. They ultimately caught up with the car and pulled it over in the parking lot of the Breukelen

Housing Project where Isidro Sanchez was being held. One of the passengers in the car was Joshua Simon, who was later arrested at the apartment when Isidro Sanchez was rescued.

After Brown—who identified himself as Sharif Mason—was given a summons, he was allowed to drive away. The manner in which Brown was identified as the driver of the vehicle that was stopped in the parking lot of the Breukelen Housing Project gave rise to the incident involving the courtroom closure. While the identification of Joshua Simon as the passenger was established by an unusual scar on his left cheekbone that he told the officers had been inflicted by a gunshot, the identification of Andre Brown as the driver was somewhat more complicated because neither of the police officers who stopped the car could later identify him. Nevertheless, persuasive documentary evidence established that the name Sharif Mason, which Brown gave when he was stopped, was an alias derived from his middle name, "Sharif," and his mother's last name, "Mason."

Andre Brown's birth certificate states that his full name is Andre Sharif Brown, that he was born on July 29, 1970, and that his mother's name was Sandra Mason. Indeed, his mother was listed as the subscriber of two telephone numbers at 3405 Neptune Avenue in Brooklyn. This was similar to the address on the Social Security card with the name Sharif Mason that Brown produced as his only identification when his car was stopped.[2] Brown had also been arrested twice before, once by Police Officer Shea and once by Police Officer Richard Roe. On both of these occasions he gave information as part of the pedigree process attendant to arrest that also confirmed that he and Sharif Mason were the same person.

Their testimony, however, was censored to eliminate any reference to the fact that Brown had been arrested. Instead, Police Officer Shea identified Brown as a person

---

**2.** Police Officer Knight testified that the address on Brown's social security card was listed as 3504 Neptune Avenue, rather than the 3405 Neptune Avenue address at which the telephone lines were registered in the name of petitioner's mother. The similarity in the digits of the address suggests that any discrepancy results from either a transcription error or an effort by Andre Brown to give a false address when pulled over. No issue was made of this discrepancy in the defense summation.

with whom he had a "conversation" on October 30, 1990, in which Brown told him his name was Sharif Brown and that he resided at 3405 Neptune Avenue in Brooklyn. Respondent's Appendix at 14–15 (hereafter cited as "A. __"). Similarly, Police Officer Roe identified Brown as a person with whom he had a "conversation" on June 24, 1990, approximately a year before the kidnapping. In the conversation, petitioner identified himself as Sharif Mason, gave his date of birth as July 29, 1971, and his address as 3405 Neptune Avenue. (A.27–28).

The courtroom was sealed only during Police Officer Roe's testimony.[3] At the beginning of the afternoon session on the day Officer Roe testified, the prosecutor asked to have the courtroom cleared during the hearing to determine whether to seal the courtroom when Officer Roe testified before the jury. (A.16.) In response to this application, Brown's counsel objected as follows:

> Of course, I would object to the sealing of the courtroom. It's a public trial. This officer, as I understand it, no longer works in Manhattan. He works in another jurisdiction [Brooklyn]. He has nothing at all to do with the crime of which my client is charged.

(A.16–17).

The trial judge then ruled that the hearing on whether to seal the courtroom was "not part of the trial" and granted the motion to clear the courtroom for the hearing. After the courtroom was cleared for the hearing, the prosecutor placed on the record the basis for his application in some detail. (A.17–18). The prosecutor observed that Officer Roe "is currently engaged as an undercover police officer in the Brooklyn North Narcotic Division." (A.17). Although he was no longer working in Manhattan as an undercover police officer, "he previously worked [for two weeks] in Manhattan as an undercover officer, and he still has trials which he must attend in Manhattan, which arose out of the arrests he made in Manhattan or cases in which he participated in Manhattan. So, he's concerned about protecting his identity in

this courthouse and in this area, as well as in [sic] part of Brooklyn where he currently works." (A.18).

When the prosecutor concluded, Brown's counsel said nothing more than: "I'd object judge." (A.19). Officer Roe then entered the courtroom and testified about his undercover work in a manner consistent with the offer of proof. Specifically addressing the issue of his safety, Officer Roe gave the following testimony:

> Q Does your name and identifying information appear on the New York Police Department roster?
>
> A No, it doesn't.
>
> Q Why are those steps taken to protect your identity?
>
> A They are taken as safety measures.
>
> Q What is your policy towards testifying in open court?
>
> A Usually have sealed courtrooms.
>
> Q Why is that?
>
> A To protect my identity and also for my safety.
>
> \* \* \* \* \* \*
>
> THE COURT: And I understand that it was your idea that you should request to have this courtroom sealed?
>
> THE WITNESS: That is correct, sir.
>
> THE COURT: That's because—
>
> THE WITNESS: My safety, sir.
>
> THE COURT: Your physical safety?
>
> THE WITNESS: That is correct.

(A.21, 24).

After Officer Roe concluded his direct testimony, the trial judge asked Brown's counsel whether he had any questions. Counsel responded: "No judge. I just have my standing objection." (A.24). The trial judge then asked whether anyone had "anything to say." (A.24). Brown's counsel responded: "I stand on the record judge." (A.25). The trial judge then gave the following reasons for granting the motion to close the courtroom when Officer Roe testified before the jury:

---

**3.** When he testified at the closure hearing and before the jury, Officer Roe was identified only by his badge number. Rather than identify him

by badge number or by his true name, we use this pseudonym here.

He's really an undercover officer. He's really concerned for his safety, and he did have contact with people involved in this case. And as Mr. Krantz [the Assistant District Attorney] has pointed out, most of the audience, sometimes all of the audience, have been relatives or friends of the defendant, and they, for the most part, I believe, live in Brooklyn, as does the defendant, and that's the borough where this particular officer is now working. I think a case has been made out that the Court should take some cognizance of the danger and the hazards of his particular specialty within the Police Department ...

(A.25). Brown's counsel said nothing in response to this statement. After Officer Roe concluded his testimony before the jury, which was then excused for the day, Brown's counsel returned to the subject in the following colloquy with the judge:

Mr. Smith: For the record, I object to the whole testimony that just came in.

The Court: I understand. On the grounds that it violates the public hearing and public trial aspect of the Constitution.

Mr. Smith: Even [sic] to the last witness in court before the jury. I have my standing objection.

(A.33).

The case was ultimately submitted to the jury on three counts of first degree kidnapping. After deliberating for approximately five-and-a-half hours, the jury found Brown guilty on all three counts. On his direct appeal to the Appellate Division, Brown's challenge to the courtroom closure was rejected because the issue was "not preserved for review." The Appellate Division reached this conclusion because "the defendant voiced only general objections to the closure and did not cross-examine the detective or otherwise challenge the People's proof that his safety would be endangered by testifying in open court." *Brown*, 216 A.D.2d at 100, 627 N.Y.S.2d at 925. Because we do not regard the courtroom closure here to have been improper or of sufficient magnitude to warrant setting aside the conviction, we do not pause to consider whether the Appellate Division's preservation ruling was consistent with New York law, *see* N.Y.Crim. Proc. Law

§ 470.05(2) (McKinney 1994); *Jones v. Vacco,* 126 F.3d 408, 414 (2d Cir.1997), or whether the procedural default it invoked reflected a "firmly established and regularly followed state practice" that would be entitled to deference here. *James v. Kentucky,* 466 U.S. 341, 348, 104 S.Ct. 1830, 1835, 80 L.Ed.2d 346 (1984).

Our holding that the courtroom closure here was not error and that, even if it was, habeas corpus relief is not warranted turns in large measure on the significance of the testimony during the closure itself. Specifically, this case did not involve the classic courtroom closure during the testimony of an undercover police officer who was a party to a buy-and-bust drug transaction with the defendant. In such a case, "the prosecution invariably centers around this witness: the undercover officer who purchased the drugs provides the only testimony as to the defendant's identity as the seller. The only additional testimony is provided by the arresting officer and, in some cases, a police chemist." *Ayala v. Speckard,* 131 F.3d 62, 79 (2d Cir. 1997) (en banc) (Parker, J., dissenting). While Officer Roe happened to have been an undercover officer when he testified, this case did not involve a drug transaction with the petitioner, nor did his testimony directly relate to the criminal activity for which petitioner was charged. Instead, Officer Roe gave cumulative testimony with respect to a collateral issue in this case. Under these circumstances, as we now proceed to show, the closure did not violate the Public Trial Clause, nor does it warrant the disproportionate remedy of a new trial.

## DISCUSSION

■ We begin by stating the obvious. The brief courtroom closure here did not affect the fairness of the trial or alter its outcome. Nor can it be said to have seriously undermined the most frequently cited considerations underlying the Public Trial Clause of the Sixth Amendment. The earliest justification offered for the ancient common law practice of holding a public trial was that it tended to improve the quality of testimony. *See* Max Radin, *The Right to a Public Trial,* 6 Temple L.Q. 381, 384 (1932)

(hereafter "Radin"). According to Wigmore, a public trial has the subjective effect of produc[ing] in the witness' mind a disinclination to falsify; first, by stimulating the instinctive responsibility to public opinion, symbolized in the audience, and ready to scorn a demonstrated liar; and next, by inducing the fear of exposure of subsequent falsities through disclosure by informed persons who may chance to be present or to hear of the testimony from others present.

6 Wigmore, *Evidence* § 1834 at 435–36 (Chadbourn rev.1976). Wigmore continues, "[o]bjectively, it secures the presence of those who by possibility may be able to furnish testimony in chief or to contradict falsifiers and yet may not have been known beforehand to the parties to possess any information." *Id.* at 436.

Wigmore's analysis of the subjective effect of a public trial on a witness' "disinclination to testify falsely" is not universally shared; nor are we prepared to accept it without supporting empirical evidence. As Max Radin has observed: "Hale and Blackstone [upon whom Wigmore relies] can apparently think of no other reason for the publicity than the fact that a witness might be ashamed to say in public what he would be likely enough to say in private. They tell us this makes for truth. How it does is not apparent. Indeed, it might very well lead to the opposite." Radin at 384. See *United States ex rel. Bruno v. Herold,* 408 F.2d 125 (2d Cir.1969), *cert. denied,* 397 U.S. 957, 90 S.Ct. 947, 25 L.Ed.2d 141 (1970); and *People v. Chan,* 230 A.D.2d 165, 656 N.Y.S.2d 22 (1st Dept.1997), *aff'd,* 91 N.Y.2d 913 (1998), for graphic examples of how the presence of hostile or intimidating spectators may have a chilling effect on lay witnesses' testimony.

In any event, the assumption that a witness would speak more truthfully in public, because of shame or fear of public exposure of a lie, is one that may have had some basis in a different time and place when a courtroom audience comprised members of the community who knew the parties and who may have had firsthand knowledge of the facts. Wigmore himself recognizes that the assumption that a public trial will likely increase the possibility that a person with knowledge will come forward to contradict "falsifiers" is a throwback to "earlier days in England, when *attendance at court* was a common mode of passing the time for all classes of persons." *Id.* (emphasis in original). While Wigmore suggests that such a possibility cannot be ruled out in cases that receive widespread media coverage, this routine case was not the subject of any media coverage, and it is conceded that, except for a handful of the petitioner's family and friends, the courtroom was largely empty of spectators during the trial.

Moreover, even if the courtroom had been packed, petitioner enjoyed a greater chance of winning the lottery than of having a transient spectator in the courtroom who would have remembered witnessing the "conversation" with petitioner about which Police Officer Roe testified. Indeed, the likelihood of this taking place is diminished to the point of fantasy by the expurgated nature of Officer Roe's testimony. Police Officer Roe did not simply remember a "conversation" that he had with petitioner on a public street two-and-a-half years earlier. Rather, Police Officer Roe remembered petitioner because he arrested him on that date and he recollected the conversation with the aid of "the on-line booking sheet, the arrest report and the officer's memo book relating to the case." (A.26). Under these circumstances, it is inconceivable that the closure excluded a spectator who could have contradicted the witness.

Similarly unaffected in any significant way is the public confidence in the administration of justice, which is said to be enhanced "when its doors are open to all, litigants and non-litigants alike." *People v. Jones,* 47 N.Y.2d 409, 416, 418 N.Y.S.2d 359, 364, 391 N.E.2d 1335, 1340 (1979) (citing 6 Wigmore, *Evidence* § 1834 (Chadbourn rev.1976)). Setting aside the fact that this is more a justification for opening trials to the public than for making a public trial a right of an accused, the public was unaware of this routine trial and would probably have considerable sympathy for the considerations that prompted its brief closure. More importantly, a stenographic transcript of Officer Roe's

testimony was available to anyone interested in what he had to say when the proceeding was closed.

Of course, for the reasons suggested above, it is not surprising that, when it discussed the core value that the Public Trial Clause is now understood to protect, the Supreme Court relegated the foregoing considerations to a footnote. *In re Oliver*, 333 U.S. 257, 270–71 n. 24, 68 S.Ct. 499, 506 n. 24, 92 L.Ed. 682 (1948) (Black, J.). Instead, Justice Black focused on the critical role public trials play in assuring fairness of the criminal processes:

> The traditional Anglo–American distrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the French monarchy's abuse of the *lettre de cachet.* All of these institutions obviously symbolized a menace to liberty. In the hands of despotic groups each of them had become an instrument for the suppression of political and religious heresies in ruthless disregard of the right of an accused to a fair trial. Whatever other benefits the guarantee to an accused that his trial be conducted in public may confer upon our society, the guarantee has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution. The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.

*Id.* at 268–70, 68 S.Ct. at 505–06 (footnotes omitted).

This is a consideration that speaks to the corrosive effect that a system of secret trials has on the fair administration of justice. In a system where public trials are the rule, however, not every improper partial closure implicates this concern. *Cf. Peterson v. Williams*, 85 F.3d 39, 43 (2d Cir.) (observing that this concern is "hardly in issue in this case given the brevity and inadvertence of the closure."), *cert. denied,* —— U.S. ——, 117 S.Ct. 202, 136 L.Ed.2d 138 (1996). Indeed, petitioner's trial here was a public trial. The brief closure, even if unjustified, hardly turned it into an "instrument[ ] of persecution." *In re Oliver*, 333 U.S. at 270, 68 S.Ct. at 506.

More significantly, unlike *In re Oliver*, which involved a summary criminal contempt trial held in secret before a "one-man grand jury," or *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), where a hearing on the admissibility of evidence was closed to the public, petitioner's trial was never completely closed to the public because he was tried before a jury composed of fifteen representatives of the community (twelve jurors and three alternates), who may have outnumbered the handful of spectators in the courtroom. In a thoughtful and compelling discussion of the historical backdrop from which the right of "the accused" to a public trial emerged, Max Radin suggests that this "traditional feature" of English trials was "more or less accidental" rather than "a deliberately planned safeguard against the dangers incident upon secrecy." Radin at 388–89. As Radin explains:

> What happened, then, was that a traditional feature of English trials, more or less accidental, was carried over in to the American systems, and since it was relatively ancient, was treated with the reverence which so many other elements of the common law received, especially from the lawyers of the community. I have called it accidental because it seems almost a necessary incident of jury trials, since the presence of a jury—involving a panel of thirty-six men and more—already insured the presence of a large part of the public. We need scarcely be reminded that the jury was the *patria*, the "country" and that it was in that capacity and not as judges, that it was summoned.

*Id.* at 388.[4] *See also In re Oliver*, 333 U.S. at 266, 68 S.Ct. at 504 (observing that a public

---

4. Radin's reference to a jury "involving a panel of thirty-six men and more" appears to speak to the period when the trial jury was composed of members of the grand jury that presented the charge and of jurors who were added for the purpose of trial. 1 W.S. Holdsworth, A HISTORY OF ENGLISH LAW 325 (3d ed.1922). "The process by which twelve came to be the usual number of the jury was very gradual...." *Id.* at 325 n. 2.

trial "evolved ... as an accompaniment of the ancient institution of jury trial").

The Sixth Amendment undeniably confers on a defendant a right to a "public trial, by an impartial jury," which is violated when members of the public are unjustifiably excluded. Nevertheless, Radin's discussion of the jury's role in the evolution of the right to a public trial reminds us that the closure here was partial not only because it involved a few minutes of trial testimony, the transcript of which was available to the public, but also because it did not wholly exclude representatives of the community. This is not the scenario presented in *In re Oliver* or in the writings of Jeremy Bentham from which Justice Black quoted there. *See* 1 Jeremy Bentham, RATIONALE OF JUDICIAL EVIDENCE 524 (1827) ("[S]uppose the proceedings to be completely secret, and the court, on the occasion to consist of no more than a single judge,—that judge will be at once indolent and arbitrary ... ") (quoted in *In re Oliver*, 333 U.S. at 271, 68 S.Ct. at 506).

If we were writing on a clean slate, the foregoing discussion alone could be sufficient to reject petitioner's request for the disproportionate remedy of a new trial. Prevailing Supreme Court and Second Circuit precedent, however, prevents such a direct disposition. Nevertheless, we have explored in detail the issue whether the closure significantly impaired the values furthered by the public trial guarantee because such a discussion must inform the resolution of the two issues presented by this appeal: (1) whether the closure here violated the Public Trial Clause; and (2) even if it did, whether the violation was of a sufficient magnitude to warrant habeas corpus relief. Against this backdrop, we address them in turn.

**A. *The Propriety of the Closure*[5]**

█ The courtroom closure at issue here can be justified by reference to the familiar four-factor test enunciated in *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). In *Waller*, the Supreme Court

held that (i) the party seeking to close a portion of a criminal trial must advance an overriding interest that is likely to be prejudiced by an open courtroom; (ii) the closure must be no broader than necessary to protect that interest; (iii) the trial court must consider reasonable alternatives to closing the proceeding; and (iv) the trial court must make findings adequate to support the closure. *Id.* at 48, 104 S.Ct. at 2216–17.

*(i) Overriding interest that is likely to be prejudiced.* According to the State, the overriding interest that justified closure in this case had two components: the interest in keeping the undercover officer's identity secret and the interest in preserving his safety. The former interest is not persuasive, because the States's only articulated ground of concern was that much of the trial's audience lived in Brooklyn, where the officer worked. *See Vidal v. Williams*, 31 F.3d 67, 69 (2d Cir.1994), *cert. denied*, 513 U.S. 1102, 115 S.Ct. 778, 130 L.Ed.2d 672 (1995) (holding that without more, the fact that audience members live in the same borough where an undercover officer works does not justify closure on the basis of concerns for the officer's cover).

The State's concern for the officer's safety had a stronger basis. The officer was the main witness in several cases pending in the Manhattan courts where Brown's trial was taking place, and the officer was concerned that his safety would be jeopardized if anyone involved in one of those cases were to enter the courtroom while he was testifying against Brown. We have "repeatedly acknowledged the dangerous nature of the drug trade and the genuine need of law enforcement agents to protect themselves from the deadly threat it may pose." *See United States v. Alexander*, 907 F.2d 269, 273 (2d Cir.1990), *cert. denied*, 498 U.S. 1095, 111 S.Ct. 983, 112 L.Ed.2d 1067 (1991). Given the predisposition of drug dealers to violence, and the "threats of physical and permanent harm and reprisals" involved in the drug-related kidnapping of Isidro Sanchez to which the trial judge made reference, Officer

---

5. Judge Jacobs would decide this case solely on the ground stated in this section, and would not reach Part B of the Discussion.

Roe was understandably concerned that his safety would be jeopardized should one of those parties enter the courtroom as a spectator.

◾ We held in *Ayala v. Speckard, supra,* that under this prong of the *Waller* test the trial court must "require persuasive evidence of serious risk to an important interest in ordering any closure." *Ayala,* 131 F.3d at 70. It is true that an officer's undercover status will not in itself support closure of the courtroom during his testimony. At the same time, however, as *Ayala* emphasized, "the more extensive is the closure requested, the greater must be the gravity of the required interest and the likelihood of risk to that interest." *Id.* That positive correlation works in both directions. In this case the closure was brief and the testimony given during closure was merely corroborative; the State's burden therefore was not a heavy one, and the limited likelihood that the undercover officer's safety would be prejudiced by an open courtroom in this case had sufficient weight in the balance. *But cf. Ayala v. Speckard,* 89 F.3d 91, 95–96 (2d Cir.1996) (no justification under *Waller* for a "rule that, despite the Sixth Amendment, no undercover officer who intends to return to undercover work need testify in open court"), *vacated on rehearing en banc, Ayala v. Speckard,* 131 F.3d 62 (2d Cir.1997).

*(ii) Narrow tailoring of the closure.* The courtroom was closed only for the length of the officer's brief testimony. The transcript of the proceeding, never sealed, was available to the public. Under these circumstances, the closure was no broader than necessary to protect the State's interest in ensuring the safety of the undercover officer. *See Ayala,* 131 F.3d at 72 (holding that closure was "limited not only because it last[ed] only for the testimony of one witness ... but also because there [was] no limitation at all on the right of the public or the press to examine the transcript of the officer's testimony").

Brown contends that the closure was overly broad because his family was excluded from the courtroom along with the general public. In *Vidal,* we pointed out that the Supreme Court has demonstrated "a special concern for assuring the attendance of family members of the accused," *Vidal,* 31 F.3d at 69 (discussing *In re Oliver,* 333 U.S. at 271–72 & n. 29, 68 S.Ct. at 507 & n. 29), and we held that a trial court cannot deny a defendant's request to keep his family members in court simply because the family resides in the borough where the undercover officer works. *Vidal,* 31 F.3d at 69. However, Brown did not ask that his family be permitted to stay; Brown therefore cannot argue that their exclusion renders the closure overbroad. *See Ayala,* 131 F.3d at 72 (distinguishing between cases where defendant requested that family members be permitted to remain and cases where no such request was made).

*(iii) Consideration of alternatives to closure.* Brown asserts that the trial court's failure to consider, *sua sponte,* alternatives to closure of the courtroom during the officer's testimony violates *Waller.* Our reasoning in *Ayala* forecloses this line of argument. There, we held that closure of the courtroom during the testimony of a single witness is itself a narrower alternative than closure for the duration of the proceeding. The trial judge has no further obligation to "consider alternatives to the alternative," in the absence of any request from the defendant, *id.* at 71, and Brown made no such request.

*(iv) Findings adequate to support closure.* Before deciding to close the courtroom, the trial judge held a hearing at which he took testimony and allowed each party to present argument. He credited certain testimony and he issued a ruling based upon the record. Specifically, as discussed *supra,* the judge found that the officer "was really concerned for his safety." While the reasons he gave for concluding that this fear was objectively reasonable were neither entirely accurate nor particularly compelling, the strength of the judge's findings must be evaluated by reference to the very limited scope of the closure that they support; by that standard, the trial court's findings were adequate. *Cf. Woods v. Kuhlmann,* 977 F.2d 74, 77-78 (2d Cir.1992) (holding that the fourth *Waller* factor was satisfied, despite the lack of specific findings of fact, where the "information gleaned" from the record was " sufficient to support the

partial, temporary closure of petitioner's trial")

## B. *The Propriety of the Remedy*

 Even if the courtroom should not have been closed during the testimony of Officer Roe, it is unnecessary to set aside the conviction here. In *Waller*, where an entire suppression hearing was closed to the public, the Supreme Court ordered a new suppression hearing on direct appeal. Justice Powell gave the following explanation for the holding that the defendant should not be required to prove specific prejudice in order to obtain relief:

> While the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance, the Framers plainly thought them nonetheless real. See also *State v. Sheppard*, 182 Conn. 412, 418, 438 A.2d 125, 128 (1980) ("Because demonstration of prejudice in this kind of case is a practical impossibility, prejudice must necessarily be implied."); *People v. Jones*, 47 N.Y.2d 409, 416, 418 N.Y.S.2d 359, 364, 391 N.E.2d 1335, 1340 (1979) ("The harmless error rule is no way to gauge the great, though intangible, societal loss that flows" from closing courthouse doors).

*Waller*, 467 U.S. at 49–50 n. 9, 104 S.Ct. at 2217 n. 9.

This explanation suggests that the purpose of reversing a conviction for a partial closure of a trial is not to correct an error that may have caused any real harm to the defendant or that posed any risk of an unreliable outcome. Instead, the remedy of reversal is a procedural device to ensure that "the benefits of a public trial," although "frequently intangible, difficult to prove, or a matter of chance," are not lightly disregarded. As Judge Walker recently observed in a case that held that the public was improperly excluded from the rendition of the verdict, "if we were to hold that the error was not structural and thus subject to harmless error analysis, it would almost always be held to be harmless. In this way, the right would become a right in name only since its denial would be without consequence." *United States v. Canady*, 126 F.3d 352, 364 (2d Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1092, 140 L.Ed.2d 148 (1998).

*Canady* was a case tried without a jury. The trial judge's decision and order were mailed to the defendant. The remedy ordered in that case was a remand to the district court for a public pronouncement of its decision. This was a harmless remedy—one which "may be viewed by some as an unnecessary formality." *Canady*, 126 F.3d at 364. Unlike *Canady*, petitioner here is a state prisoner who seeks to upset his conviction and obtain a new trial. We should proceed with some caution before ordering such disproportionate relief in a case in which the trial judge did not "deliberately enforce[ ] secrecy in order to be free of the safeguards of the public's scrutiny," *Levine v. United States*, 362 U.S. 610, 619, 80 S.Ct. 1038, 1044, 4 L.Ed.2d 989 (1960), and in which the error is not of "the sort that risks an unreliable trial outcome and the consequent conviction of an innocent person." *O'Neal v. McAninch*, 513 U.S. 432, 442, 115 S.Ct. 992, 997, 130 L.Ed.2d 947 (1995). Indeed, even in a case that involves such an error, and thus implicates one of the "basic purposes underlying the writ," a more lenient harmless error standard is applied in a habeas corpus proceeding than on direct appeal. *Id;* *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

The fact that this case involves an error that has been described as "structural"—at least where closure was complete—is not consequential. That term was used in *Arizona v. Fulminante*, 499 U.S. 279, 309–10, 111 S.Ct. 1246, 1264–65, 113 L.Ed.2d 302 (1991), where the Supreme Court held that the admission of a coerced confession was a "trial error" subject to the harmless error rule. The Court distinguished this error from five other cases (of which *Waller v. Georgia* was one) in which it had held that certain "structural errors"—which affect "[t]he entire conduct of the trial from beginning to end"—were not subject to the harmless error rule and required automatic reversal. *Id.* at 309, 111 S.Ct. at 1264–65.

 In *Yarborough v. Keane*, 101 F.3d 894 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1706, 137 L.Ed.2d 831 (1997), we made

clear our understanding that *"Fulminante's* list of examples of violations that have been held exempt from harmless error review [does not] mean that any violation of the same constitutional right is a 'structural defect,' regardless whether the error is significant or trivial." *Id.* at 897; *United States v. Canady,* 126 F.3d at 364 ("not every violation of [the right to a public trial] is free from harmless error review"). Rather, in order to determine whether a particular error is structural "we must look not only to the right violated, but also at the particular nature, context, and significance of the violation." *Yarborough,* 101 F.3d at 897; *see also United States v. Gonzalez,* 110 F.3d 936, 946 (2d Cir.1997) (same).

While the issue in *Yarborough* involved the exclusion of a defendant from part of his own trial, it posed the following hypothetical in support of its analysis:

> *Fulminante* notes, for example, that the exclusion of the public, without justification, from the entirety of a crucial seven-day suppression hearing is structural error. *See Fulminante,* 499 U.S. at 310, 111 S.Ct. at 1265 (citing *Waller v. Georgia,* 467 U.S. 39, 49 n. 9, 104 S.Ct. 2210, 2217 n. 9, 81 L.Ed.2d 31 (1984)). It does not necessarily follow, however, that the Supreme Court would find structural error and automatically vacate a conviction if the judge granted a motion to close the courtroom for a hearing, took a few minutes of innocuous introductory testimony, and then reconsidered, reversed the ruling and reopened the hearing to the public. *Cf. Peterson v. Williams,* 85 F.3d 39 (2d Cir.) (brief and inadvertent continuation of proper courtroom closure, not noticed by any of the trial participants, although not permitted by law did not rise to the level of a constitutional violation), *cert. denied,* —— U.S. ——, 117 S.Ct. 202, 136 L.Ed.2d 138 (1996).

101 F.3d at 897 n. 1.

In *Peterson v. Williams, supra,* which is cited in *Yarborough,* we affirmed the denial of the writ in a case where the courtroom inadvertently remained sealed during the testimony of the defendant (after an undercover officer had testified). Specifically, we held that "where the closure was 1) extremely short, 2) followed by a helpful summation, and 3) entirely inadvertent," it was sufficiently trivial that "the defendant's Sixth Amendment rights were not breached." *Peterson,* 85 F.3d at 44. We reached this conclusion because the partial closure did not significantly impair "the values furthered by the public trial guarantee." *Id.* at 43.

There is some tension between the analysis in *Yarborough* and the analysis in *Peterson. See* John M. Walker, *Harmless Error Review in the Second Circuit,* 63 Brooklyn L.R. 395, 401–404 (1997). *Yarborough* holds that the traditional harmless error test would be applied to violations of the Sixth Amendment that were not substantial enough to be considered "structural." *Yarborough,* 101 F.3d at 898–99. *Peterson* explicitly rejects a harmless error analysis because it concludes that "the defendant's Sixth Amendment rights were not breached." *Peterson,* 85 F.3d at 44. Nevertheless, there is also overlap in the approaches taken in *Peterson* and *Yarborough,* and support for both may be found in the manner in which the Supreme Court has treated two of the structural errors identified in *Fulminante,* namely, "the total deprivation of the right to counsel at trial," and the denial of the defendant's "right to self-representation at trial." *Fulminante,* 499 U.S. at 309–10, 111 S.Ct. at 1265 (citing *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) and *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984)).

Where a defendant has been represented by counsel, he can obtain relief on the basis of the inadequate assistance of counsel only by demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). Where counsel's deficiencies did not affect the outcome of the trial, the Sixth Amendment has not been violated. *Id.* Similarly, where a defendant's wish to represent himself has been honored, the Supreme Court has refused to reverse a conviction based on involvement of standby counsel where "[t]he intrusions by counsel

... were simply not substantial or frequent enough to have seriously undermined [the defendant's] appearance before the jury in the status of one representing himself." *McKaskle,* 465 U.S. at 187, 104 S.Ct. at 955–56. While he disagreed with this characterization of standby counsel's conduct in that case, Justice White agreed that "not every transgression of standby counsel constitutes reversible error ... A trial court's tolerance of isolated and innocuous participation by standby counsel could perhaps be characterized—in line with the Court of Appeals' holding—as harmless constitutional error; one also could conclude that such participation simply does not rise to the level of a constitutional violation." *Id.* at 197, 104 S.Ct. at 961 (White, J., dissenting).

Because we are satisfied that the result here is the same under either approach, we do not choose between *Yarborough* or *Peterson. See* Walker, *supra,* at 403 ("[I]t may be that the differences in analytical approaches between the two cases are insignificant in terms of the ultimate outcome."). Indeed, in one respect this case provides an even more compelling basis than *Peterson* for concluding that "the defendant's Sixth Amendment rights were not breached." The closure in *Peterson* took place during the testimony of the defendant—one of the most significant trial witnesses. By contrast, the closure here took place during testimony which—if not innocuous—was clearly cumulative on the collateral issue for which it was offered. Petitioner's counsel himself described the subject matter of Officer Roe's testimony as "collateral," (Trial Tr. 98), and we are convinced by any standard that the result would have been the same had Roe not testified.

*Peterson* did observe that the closure was mitigated by the fact that the defendant's testimony was subsequently recounted in full during summation. *Peterson,* 85 F.3d at 44. This was deemed significant because it "could well have served to give notice to some potential corroborating witnesses," *id.,* who presumably would have interrupted the summation and caused the defense case to be reopened. This possibility—like the possibil-

ity of some transient spectator. contradicting the testimony—does not implicate the core value underlying the Sixth Amendment and is too farfetched to warrant setting aside the conviction in a routine case tried in a near-empty courtroom. In any event, the testimony of both Officer Roe and of Police Officer Shea (who testified in public) was summarized in both the defense and prosecution summations, (A.37–38, 41), and it was the subject of extensive argument in open court where spectators heard a more accurate and meaningful description of it than the jury.

Of course, the closing in *Peterson* was inadvertent. Here it was the consequence of a conscious ruling by the trial judge. It is unclear from the analysis in *Peterson* whether this fact would alter the conclusion that "no Sixth Amendment violation occurred." *Peterson,* 85 F.3d at 44 and n. 8. Nevertheless, we do not regard it to be controlling on the issue whether petitioner is entitled to the disproportionate remedy he seeks in this habeas corpus proceeding. If the remedy of a new trial without a showing of prejudice is intended to deter unjustified courtroom closures, then the necessity for that remedy should depend on the degree to which it "could be charged that the judge deliberately enforced secrecy in order to be free of the safeguards of the public's scrutiny." *Levine,* 362 U.S. at 619, 80 S.Ct. at 1044 (such a charge could not be made where defendant failed to object to closure). While the closure in the present case came over petitioner's objection, our review of the record persuades us that the judge simply made a good faith mistake of the kind that judges make without the benefit of effective advocacy.

The prosecutor here was faced with a witness who, quite understandably, did not wish to compromise his safety in the slightest degree, and he accommodated this concern by moving to have the testimony taken in a sealed courtroom. The record shows that, when he failed to dissuade the trial judge from sealing the courtroom during the closure hearing, petitioner's counsel took a passive posture for the remainder of the hearing.[6] After Officer Roe testified at the

---

**6.** Petitioner offered two anemic arguments in opposition to the prosecutor's request for sealing

the closure hearing itself, *i.e.,* that Officer Roe "no longer works in Manhattan[, h]e works in

hearing, petitioner's counsel passed when asked if he had any questions, and he likewise declined the opportunity he was offered to make any further argument. Petitioner's counsel also neglected to draw the trial judge's attention to the burden that the prosecution was required to meet to justify closure under New York law, much less under *Waller v. Georgia,* or suggest why the standard was not met here. Indeed, while petitioner's argument here focuses principally on the exclusion of his family from the courtroom, relying heavily on *Vidal v. Williams, supra,* see Petitioner's Brief at 15–17, petitioner's counsel failed to make any offer of proof as to who was in the audience, nor did he make a specific request—as the defendant did in *Vidal*—that certain members of his family be allowed to remain. *See Vidal,* 31 F.3d at 68 ("Defense counsel requested that Vidal's parents, who were present at trial, be allowed to remain in the courtroom."). Because of counsel's silence, the only basis for concluding that any member of petitioner's family was actually excluded was the assumption made by the prosecutor, (A.22), and accepted by the judge, that "most of the audience, sometimes all of the audience, [were] relatives or friends of the defendant." (A.25).

Counsel's passivity stands in stark contrast to the reasoned and persuasive objections he made in an extended argument over several days regarding the subject matter of Police Officer Roe's testimony and the related evidence regarding petitioner's use of the alias "Sharif Mason," which petitioner's counsel understood was not helpful to him and which involved the kind of discretionary ruling that would not likely be reversed on appeal. (Trial Tr. 95–104, 197–202, 372–74, 484–86). Indeed, the argument was successful to the extent that it eliminated any references to the fact that Officers Shea and Roe arrested petitioner.

The failure of petitioner's counsel to make a comparable effort to dissuade the trial judge from closing the courtroom detracts from the need to set aside the conviction in

order to deter violations of the Public Trial Clause. Just as reversal without prejudice serves no purpose where the closure is inadvertent, it likewise serves little purpose when the defendant makes no more than a perfunctory effort to prevent the closure. On the contrary, to the extent that a public trial serves the broader "public[ ] interest in fair trials designed to end in just judgments," *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949), that purpose is best served by requiring a defendant to press his argument in a forceful and persuasive way rather than by awarding a windfall to a defendant whose only concern may have been to preserve the record for an appeal from an error that caused him no harm.

We reiterate here that we assume that petitioner's claim was properly preserved for review by the Appellate Division and that it therefore does not involve a procedural forfeiture of the kind at issue in *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). We simply hold that petitioner's conduct is of relevance in determining the need for the writ. *Reed v. Farley,* 512 U.S. 339, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994), is particularly instructive. After his conviction became final, petitioner there sought habeas corpus relief because he had not been tried within 120 days after he came into the custody of the State of Indiana (as required by the Interstate Agreement on Detainers). The petitioner in *Reed* did not vigorously assert his right to be tried within the 120–day period. On the other hand, he did not remain totally silent on the issue of his trial date. Indeed, he specifically requested that the "trial be held within the legal guidelines of the [IAD]." *Id.* at 343–44 n. 3, 114 S.Ct. at 2294–95 n. 3 (internal quotations omitted; alteration in original). Nevertheless, he did not cite the specific provision of the IAD on which he relied and he did not object to the trial date when it was set—which was beyond the 120–day period. *Id.* at 343–44, 114 S.Ct. at 2294–95. In contrast, four days after the 120–day period expired, he sought dismissal

---

another jurisdiction [Brooklyn]" and that "he has nothing at all to do with the crime of which my client is charged." (A.16–17). Neither of these arguments had any bearing on the issue

whether Officer Roe's safety or identity would be compromised by testifying in a drug-related trial, in a courthouse in which he still expected to testify in undercover cases.

of the indictment with prejudice because he had not been tried within 120 days of his transfer as required by Article IV(c), to which he made explicit reference for the first time. *Id.* at 344, 114 S.Ct. at 2295. The Supreme Court (per Ginsburg, J.) held that this transparent sandbagging by a pro se litigant eliminated the justification for the writ: "When a defendant obscures Article IV(c)'s time prescription and avoids clear objection until the clock has run, *cause for collateral review scarcely exists.*" *Id.* at 349, 114 S.Ct. at 2297 (emphasis added).

Unlike *Reed,* the present case involves a violation of the Constitution, rather than a law of the United States. The violation alleged here and the violation in *Reed,* however, share one critical similarity. In each case the error did not affect the outcome or fairness of the trial or in any way threaten the conviction of an innocent person. When such "harmless errors" are involved, a defendant has an incentive to engage in the kind of sophisticated sandbagging .that may have taken place here, knowing that if the objection is overruled, he suffers no harm and gains the opportunity to have a guilty verdict upset. Such conduct undermines the need for the writ.

This is not the only consideration mitigating against the issuance of the writ here. The need for the writ as a remedy to deter state courts from violating the Constitution is most compelling where—notwithstanding the absence of prejudice—there is a real possibility "that state courts might be hostile to the federal law ... at stake." *Reed v. Farley,* 512 U.S. at 355, 114 S.Ct. at 2300–01; *see also* James S. Liebman and Randy Hertz, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 2.5 at 78–79 (2d ed.1994). The cases involving intentional discrimination in the selection of juries and grand juries offer a compelling example. These cases involve claims that "the state judiciary itself has purposely violated the Equal Protection Clause," *Rose v. Mitchell,* 443 U.S. 545, 561, 99 S.Ct. 2993, 3002–03, 61 L.Ed.2d 739 (1979), and, therefore, the "deterrent effect of federal review is likely to be great." *Id.* at 563, 99 S.Ct. at 3004. As Justice Marshall wrote so eloquently in *Vas-*

*quez v. Hillery,* 474 U.S. 254, 262, 106 S.Ct. 617, 622–23, 88 L.Ed.2d 598 (1986):

> Petitioner argues here that requiring a State to retry a defendant, sometimes years later, imposes on it an unduly harsh penalty for a constitutional defect bearing no relation .to the fundamental fairness of the trial. Yet intentional discrimination in the selection of grand jurors is a grave constitutional trespass, possible only under color of state authority, and wholly within the power of the State to prevent. Thus, the remedy we have embraced for over a century—the only effective remedy for this violation—is not disproportionate to the evil that it seeks to deter.

*Id.* at 262, 106 S.Ct. at 623 (footnote omitted). *See also Washington v. James,* 996 F.2d 1442, 1450 (2d Cir.1993) (Meskill, J.) ("A state court system that purposefully and unjustifiably violates a defendant's federal rights cannot be entitled to the same deference as a system that makes only innocent mistakes."), *cert. denied,* 510 U.S. 1078, 114 S.Ct. 895, 127 L.Ed.2d 87 (1994).

New York does not evince any kind of hostility to a defendant's right to a public trial. On the contrary, New York law guarantees a defendant a public trial, N.Y. Civ. Rights Law § 12 (McKinney 1992) (guaranteeing right to a public trial in state bill of rights); N.Y. Jud. Law § 4 (McKinney 1983) (requiring that all judicial proceedings be public except in limited circumstances), and the New York appellate courts have been particularly vigilant in correcting errors involving partial courtroom closures. Indeed, the number of New York cases reversing convictions for erroneous partial closures is so great that we annex those citations as an appendix rather than include them as a footnote. One of these cases, however, *People v. Rodriguez,* 209 A.D.2d 237, 618 N.Y.S.2d 335 (1st Dept.1994), is sufficiently compelling to warrant brief discussion.

The Appellate Division there reversed a conviction because of a courtroom closure where the same undercover officer who testified here gave essentially the same testimony he gave here in support of a closure applica-

tion.[7] The testimony was given in one of the undercover buys in which he engaged during his two weeks of undercover work in Manhattan. In reversing the conviction, the Appellate Division wrote that "[t]he record … does not support either a finding that the witness continued to be involved in undercover work in the community [in which the case arose] or that an ongoing investigation would have been compromised if the undercover officer had testified in open court." *Rodriguez*, 209 A.D.2d at 239, 618 N.Y.S.2d at 337. Of course, in *Rodriguez*, Officer Roe's testimony was the centerpiece of the case; here it was not. While this difference underlies our conclusion that the closure was not improper, the unwillingness of the Appellate Division to reach the merits in this case, as it often does even when it finds an issue unpreserved, suggests that it may have taken a different view. Nevertheless, its failure to do so here can hardly be attributed to hostility towards the federal public trial guarantee.

In *Reed v. Farley*, the Supreme Court responded to an argument that the denial of habeas corpus relief would undermine compliance with the Interstate Agreement on Detainers ("IAD") because state courts "might be hostile to … federal law." *Reed*, 512 U.S. at 355, 114 S.Ct. at 2300. Noting that the IAD was also a law of the State of Indiana, the Supreme Court observed: "[w]e have no more reason to suppose that the Supreme Court of Indiana seeks to undermine the IAD than we have to suppose that it seeks to undermine any other law of Indiana." *Id.* (quoting lower court opinion). The empirical evidence to which we have already alluded shows that the same is true in New York with respect to a defendant's right to a public trial. No one can possibly suggest that the denial of the writ in this case will become a license for widespread courtroom closure in New York.

On the other hand, granting the writ here has its costs. As Judge Newman wrote in *Ayala v. Speckard,* although "the right of the public and the press to attend a criminal proceeding absent circumstances justifying closure is of undoubted importance, the reversal of a criminal conviction for a trial judge's failure to consider an alternative not requested by a defendant is arguably too high a price to pay to protect that right." *Ayala,* 131 F.3d at 71. The reversal of petitioner's conviction would not only undermine New York's interest in the finality of its judgments, it would force Isidro Sanchez and his family to relive the violent crime of which he was the victim. This is likewise "too high a price to pay" for any error involved in the partial courtroom closure here.[8]

**CONCLUSION**

The old maxim *"de minimis non curat lex "* could by itself provide a sufficient basis to resolve this appeal. The need we have felt to say more should not obscure the central fact that provides a single frame for both prongs of our holding, namely, that this case involves a courtroom closure that was not substantial enough to undermine the values furthered by the public trial guarantee. Accordingly, the judgment of the district court is vacated and the case is remanded to the district court for the purpose of dismissing the petition.

APPENDIX

Over the past decade alone, New York appellate courts have reversed convictions on the basis of violations of the Public Trial Clause in no fewer than fifty cases, including at least eight Court of Appeals cases. In-

7. Petitioner relied on the *Rodriguez* case on his direct appeal and alleged that it involved the same undercover officer whom he identified by name. (A.97). The description of his work is the same as that of the undercover officer here, and the District Attorney did not take issue with this fact.

8. The same considerations move us to exercise our "considerable discretion" to address the propriety of the remedy even though it was argued for the first time on appeal. *In re McLean Indus., Inc.*, 30 F.3d 385, 387 (2d Cir.1994) (per curiam) (citation and internal quotations omitted), *cert. denied,* 513 U.S. 1126, 115 S.Ct. 934, 130 L.Ed.2d 880 (1995). Indeed, the exercise of such discretion is particularly appropriate in habeas corpus cases. As Judge Meskill wrote in a habeas case decided on a ground that was raised sua sponte, "[p]rinciples of comity and federalism bear on the relations between court systems, and those relations will be affected whether or not the litigants have raised the issue themselves." *Washington,* 996 F.2d at 1448.

deed, most of these instances involved the testimony of undercover agents, as was the case here. *See People v. Nieves,* 90 N.Y.2d 426, 660 N.Y.S.2d 858, 683 N.E.2d 764 (1997); *People v. Tolentino,* 90 N.Y.2d 867, 661 N.Y.S.2d 593, 684 N.E.2d 23 (1997); *People v. Gutierez,* 86 N.Y.2d 817, 633 N.Y.S.2d 470, 657 N.E.2d 491 (1995); *People v. Rosario,* 83 N.Y.2d 994, 616 N.Y.S.2d 334, 639 N.E.2d 1131 (1994); *People v. Martinez,* 82 N.Y.2d 436, 604 N.Y.S.2d 932, 624 N.E.2d 1027 (1993); *People v. Clemons,* 78 N.Y.2d 48, 571 N.Y.S.2d 433, 574 N.E.2d 1039 (1991); *People v. Kan,* 78 N.Y.2d 54, 571 N.Y.S.2d 436, 574 N.E.2d 1042 (1991); *People v. Mateo,* 73 N.Y.2d 928, 539 N.Y.S.2d 727, 536 N.E.2d 1146 (1989); *People v. Vargas,* —— A.D.2d ——, 663 N.Y.S.2d 649 (2d Dept.1997); *People v. Morales,* 240 A.D.2d 595, 658 N.Y.S.2d 450 (2d Dept.1997); *People v. Spence,* 239 A.D.2d 218, 657 N.Y.S.2d 645 (1st Dept.1997); *State v. Campos,* 239 A.D.2d 186, 657 N.Y.S.2d 48 (1st Dept.1997); *People v. Gayle,* 237 A.D.2d 532, 655 N.Y.S.2d 581 (2d Dept. 1997); *People v. Bobo,* 236 A.D.2d 417, 653 N.Y.S.2d 617 (2d Dept.1997); *People v. Valenzuela,* 234 A.D.2d 193, 652 N.Y.S.2d 5 (1st Dept.1996); *People v. John,* 231 A.D.2d 739, 648 N.Y.S.2d 121 (2d Dept.1996); *People v. Campble,* 231 A.D.2d 583, 647 N.Y.S.2d 283 (2d Dept.1996); *People v. Cooper,* 228 A.D.2d 297, 644 N.Y.S.2d 54 (1st Dept.), *appeal dismissed,* 89 N.Y.2d 863, 675 N.E.2d 1239, 653 N.Y.S.2d 286 (1996); *People v. Hernandez,* 228 A.D.2d 277, 644 N.Y.S.2d 196 (1st Dept. 1996); *People v. Miller,* 224 A.D.2d 639, 639 N.Y.S.2d 50 (2d Dept.1996); *People v. Parrish,* 224 A.D.2d 553, 637 N.Y.S.2d 802 (2d Dept.1996); *People v. Kilkelly,* 224 A.D.2d 446, 638 N.Y.S.2d 93 (2d Dept.1996); *People v. Alvarado,* 223 A.D.2d 712, 637 N.Y.S.2d 436 (2d Dept.1996); *People v. Ramos,* 222 A.D.2d 708, 636 N.Y.S.2d 81 (2d Dept.1995); *People v. Tejada,* 222 A.D.2d 353, 636 N.Y.S.2d 25 (1st Dept.1995); *People v. Johnson,* 222 A.D.2d 456, 635 N.Y.S.2d 49 (2d Dept.1995); *People v. Green,* 221 A.D.2d 363, 633 N.Y.S.2d 521 (2d Dept.1995); *People v. Rivera,* 220 A.D.2d 298, 632 N.Y.S.2d 122 (1st Dept.1995); *People v. Navaro,* 220 A.D.2d 623, 632 N.Y.S.2d 598 (2d Dept.1995); *People v. Carrington,* 220 A.D.2d 610, 633 N.Y.S.2d 47 (2d Dept.1995); *People v. Bess,* 220 A.D.2d 603, 632 N.Y.S.2d 634 (2d Dept. 1995); *People v. Pankey,* 219 A.D.2d 737, 631 N.Y.S.2d 766 (2d Dept.1995); *People v. Daniels,* 218 A.D.2d 748, 630 N.Y.S.2d 783 (2d Dept.1995); *People v. Green,* 215 A.D.2d 309, 627 N.Y.S.2d 21 (1st Dept.1995); *People v. Richardson,* 215 A.D.2d 697, 628 N.Y.S.2d 119 (2d Dept.1995); *People v. Ramos,* 214 A.D.2d 686, 625 N.Y.S.2d 287 (2d Dept.1995); *People v. Bici,* 211 A.D.2d 804, 621 N.Y.S.2d 666 (2d Dept.), *lv. denied,* 85 N.Y.2d 969, 653 N.E.2d 625, 629 N.Y.S.2d 729 (1995); *People v. Davis,* 210 A.D.2d 345, 620 N.Y.S.2d 15 (2d Dept.1994); *People v. Cepeda,* 209 A.D.2d 631, 619 N.Y.S.2d 128 (2d Dept.1994); *People v. Rodriguez,* 209 A.D.2d 237, 618 N.Y.S.2d 335 (1st Dept.1994); *People v. James,* 207 A.D.2d 564, 616 N.Y.S.2d 75 (2d Dept.1994); *People v. Tapia,* 207 A.D.2d 286, 615 N.Y.S.2d 380 (1st Dept.), *lv. denied,* 84 N.Y.2d 910, 645 N.E.2d 1228, 621 N.Y.S.2d 528 (1994); *People v. Cole,* 207 A.D.2d 273, 615 N.Y.S.2d 393 (1st Dept.), *lv. denied,* 84 N.Y.2d 867, 642 N.E.2d 331, 618 N.Y.S.2d 12 (1994); *People v. Mercer,* 204 A.D.2d 741, 612 N.Y.S.2d 650 (2d Dept.1994); *People v. Parker,* 194 A.D.2d 335, 598 N.Y.S.2d 490 (1st Dept.1993); *People v. Dashnau,* 187 A.D.2d 966, 591 N.Y.S.2d 124 (4th Dept.1992), *lv. denied,* 81 N.Y.2d 838, 611 N.E.2d 776, 595 N.Y.S.2d 737 (1993); *People v. Kearse,* 186 A.D.2d 978, 588 N.Y.S.2d 445 (4th Dept. 1992), *lv. denied,* 81 N.Y.2d 790, 610 N.E.2d 410, 594 N.Y.S.2d 737 (1993); *People v. Vance,* 178 A.D.2d 450, 577 N.Y.S.2d 125 (2d Dept.1991); *People v. Martinez,* 172 A.D.2d 428, 568 N.Y.S.2d 940 (1st Dept.1991); *People v. Zawistowski,* 168 A.D.2d 950, 564 N.Y.S.2d 902 (4th Dept.1990); *People v. Thompson,* 151 A.D.2d 626, 542 N.Y.S.2d 700 (2d Dept.1989); *People v. Cordero,* 150 A.D.2d 258, 541 N.Y.S.2d 417 (1st Dept.), *aff'd,* 75 N.Y.2d 757, 551 N.E.2d 103, 551 N.Y.S.2d 902 (1989); *People v. Romain,* 137 A.D.2d 848, 525 N.Y.S.2d 313 (2d Dept.1988).