**Leroy HOYT, Petitioner,**

v.

**Donna LEWIN, Superintendent, Hudson Correctional Facility, and Eliot L. Spitzer, Attorney General of the State of New York, Respondents.**

**No. 05 CIV.4947 JSR GWG.**

United States District Court, S.D. New York.

Aug. 13, 2006.

---

Laura R. Johnson, The Legal Aid Society, New York, for Petitioner.

Malancha Chanda, Assistant Attorney General, New York, for Respondent.

## ORDER

RAKOFF, District Judge.

On May 12, 2006, the Honorable Gabriel W. Gorenstein, United States Magistrate Judge, issued a Report and Recommendation in the above-captioned case recommending the denial of petitioner's petition filed pursuant to 28 U.S.C. § 2254. Subsequently, on June 15, 2006, petitioner submitted objections to the Report and Recommendation. Accordingly, the Court has reviewed the petition and the underlying record *de novo.*

Having done so, the Court finds itself in complete agreement with Magistrate Judge Gorenstein's Report and Recommendation and hereby adopts its reasoning by reference. Accordingly, the Court dismisses the petition, with prejudice. As petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253(c)(2). Clerk to enter judgment.

SO ORDERED.

## REPORT AND RECOMMENDATION

GORENSTEIN, United States Magistrate Judge.

Leroy Hoyt brings this petition for a writ of habeas corpus challenging his conviction in the Supreme Court of New York, New York County, following a jury trial, of one count of Criminal Sale of a Controlled Substance in the Third Degree (New York Penal Law § 220.39). Hoyt was sentenced as a second-felony offender to an indeterminate prison term of five to ten years. Hoyt is currently incarcerated at Clinton Correctional Facility. For the reasons stated below, the petition should be denied.

## I. INTRODUCTION

### A. Background

Hoyt and his co-defendant, Gregory Hall, were arrested for selling $30 of crack cocaine to an undercover police officer on September 29, 1999. Following a mistrial, both men were jointly re-tried in December 2000, in the Supreme Court of New York, New York County.

### 1. Pre–Trial Closure Hearing

On November 30, 2000, the trial court held a pre-trial hearing pursuant to *People v. Hinton,* 31 N.Y.2d 71, 334 N.Y.S.2d 885, 286 N.E.2d 265 (1972), to determine whether the courtroom should be closed during the testimony of the undercover police officer who had been involved in the sale of narcotics by Hoyt and Hall. *See* H. 1–37.[1] This officer, referred to as "UC 1809," testified that revealing his identity would affect his safety because of his "open investigations" in the area where the sale had occurred, and the "open cases" he had pending before the court. (H.10, 12). The court ruled that the courtroom would be closed during UC 1809's testimony, but that at the request of the defendants, members of Hoyt's family and his counsel's colleagues would be permitted to enter the courtroom at all times. *See* H. 34; Petitioner's Memorandum of Law and Appendix in Support of Petition for Writ of Habeas Corpus, dated May 2005 (Docket # 3) ("Pet.Mem."), at 4.

### 2. The People's Case

In the late evening of September 29, 1999, UC 1809 and several other officers

---

1. "H." refers to the transcript of the *Hinton* hearing. "T." refers to the transcript of the trial. "S." refers to the transcript of the sentencing. All are contained within Docket # 10. Some pages that are missing from the transcript contained in Docket # 10 are contained in the appendix to Docket # 3.

set up a "buy-and-bust" operation near West 35th Street and Eighth Avenue in Manhattan. Hall approached UC 1809 and asked him whether he was "all right." UC 1809 replied, "I'm looking for rocks." (T. 229–35). Hall asked whether UC 1809 needed "dimes"-referring to $10 bags of crack-and UC 1809 said he wanted to buy three bags. (T. 235). UC 1809 followed Hall a couple blocks north, to 38th Street, where Hall crossed the street and returned with Hoyt. (T. 235–38). UC 1809 gave Hall $30 in pre-recorded buy money, Hall gave some of that money to Hoyt, and Hoyt gave Hall the drugs, which Hall then passed to UC 1809. (T. 238–42). UC 1809 crossed the street and radioed the other officers, who arrived shortly thereafter. (T. 243, 245–46). One officer spotted Hoyt and saw him drop a brown paper bag as the officers approached. The bag was later found to contain small plastic bags of crack cocaine. (T. 48–50, 96–98, 142, 154–57, 163, 172–73, 246). The officers also found $20 of the pre-recorded buy money in Hoyt's pocket. (T. 57–67, 138–39). UC 1809 confirmed to the other officers that Hoyt was one of the people who had sold him the drugs. (T. 50, 77).

### 3. *Hoyt's Case*

Hoyt presented a defense of mistaken identity, claiming that he had been at a bar in the vicinity all evening, and was mistakenly stopped and arrested on his way home. He claimed he had never seen Hall before his arrest. (T. 391–433).

### B. *Motion for Mistrial*

At the close of evidence, Hoyt's trial counsel moved for a mistrial, contending that his law partner had attempted to enter the courtroom during UC 1809's testimony "partially to give [counsel] pictures to show the undercover," but that he had been denied entry. (T. 455). Hoyt's counsel reminded the court that he had specifically requested that his colleagues have access to the courtroom at all times, and

that the court had agreed to this. (T. 455). He stated that his partner nonetheless had been denied access to the court. (T. 455). Counsel also stated that he did not receive the pictures his partner had brought until after he had completed his cross-examination of UC 1809. (T. 455). He claimed that this was "a real *Hinton* violation" and told the court that his partner was available to testify regarding his attempt to enter the courtroom. (T. 456). Hall's counsel stated that his office mate, who was also an attorney, had been denied entrance as well. (T. 456).

The trial judge stated that he would "assume" there had been a *Hinton* violation and "just accept" that counsel's partner had attempted to enter the courtroom and been denied access by the court officer. (T. 456–57). The court noted that it was "odd" that the partner, who apparently knew the courtroom well, had not called the courtroom directly, but had instead "abandon[ed] the effort." (T. 457–58). The court then denied counsel's motion for a mistrial. (T. 459).

The following day, the prosecutor stated that according to the court officer who had been guarding the door of the courtroom on the day in question, Hoyt's counsel's partner had not requested entry into the courtroom, but had only given the officer the photographs, presumably to deliver to Hoyt's counsel. (T. 605–06). Hoyt's counsel again offered the testimony of his colleague. (T. 606). The court declined this offer, but did request that the prosecutor put the name of the court officer on the record, "in case somebody decides to have him present." (T. 606). Following this, the court asked, "Who wants to say anything?" The conversation turned to the issue of a note from the jury, and there was no more discussion of the courtroom closure. (T. 606).

**264**

### C. *Request for Adjournment*

At approximately 5:40 p.m. on Thursday, December 7, 2000, after the trial court had dismissed the alternate jurors and the jury had begun its deliberations, Hoyt's counsel requested that the court adjourn deliberations until the following Monday so that Hoyt, a practicing Muslim, could "observe his religious holiday and his First Amendment right." (T. 587). The trial court in Hoyt's previous trial had, apparently, granted such an adjournment, *see* Pet. Mem. at 7–8, and the court in the current trial had not scheduled any proceedings for the previous Friday, *see id.* at 8.

The trial judge denied the request for an adjournment, noting cases in which similar requests had been denied, but also observing that in those cases the jury had been sequestered, which it was not in the current case. (T. 588–89). The court then stated that "the [S]tate[']s paramount duty is to ensure a fair trial in a criminal action for both the defendant and People," and that, in the other cases the court had cited, the State's interest was "paramount to the individual defendant's right under the First Amendment, to exercise [his] religious freedoms." (T. 589). The court also reminded counsel that the jury had been told prior to trial that "the case would be given to them Tuesday or Wednesday [and] that deliberations were entirely up to them in terms of the length." (T. 589). The court noted that the trial had already been delayed by a day due to the illness of UC 1809, and that this was the second trial of Hoyt and Hall, which "further exacerbates the circumstances and lingers [sic] the [S]tate[']s desire to have a resolution of this." (T. 589). The court concluded that "[t]o send these jurors out into the community at this juncture, doesn't satisfy the [S]tate[']s needs." (T. 590). The court later added that "everybody wants a verdict," and that "to the extent that people are out there for three days, [it] increases the possibility that somebody will get sick, get injured, have a family tragedy," and thus that "it just exacerbates the possibility of a retrial." (T. 599).

Hoyt's counsel argued that there were no "provisions or anything made so that he can pray here or at some local facility," and that in case the jury required readback of testimony, Hoyt would be missing for "that critical phase, to advise me or to help me." (T. 592). The court rejected these arguments and added that there was a "Muslim service across the street," although the judge stated that he could not guarantee that Hoyt would be able to attend, since the Department of Corrections had failed to transport a prisoner to such services on a prior occasion. (T. 593–94). The judge declined to make any promises to Hoyt in this regard, because "when the time comes to deliver ... hopes and promises are dashed." (T. 595). Hoyt's counsel responded that it was "a shame" that the court was making Hoyt "pick between those two choices," (T. 595), and that he was concerned that the jury would draw an adverse inference from Hoyt's likely absence. (T. 595).

The next day, Friday, December 8, 2000, Hoyt did not appear in court, and his counsel renewed his request for an adjournment. (T. 601). The court responded that an adjournment would cause the court to "lose control" of the jury, and that the "confluence of things make it seem to me, we don't want to second this trial [sic] and the [S]tate's interest in getting a verdict surpasses the defendant's right to be present at his verdict." (T. 603).

The jury then sent in a note that it was deadlocked, at which time Hoyt's counsel requested that the court inform the jury that Hoyt was not present because he was observing a religious holiday, and that the jury should draw no negative inference from that fact. (T. 606–07). The judge

stated to the jury, "Mr. Hoyt is not here and he has a right not to be here. You should not draw any inference from his not being here." (T. 607). The court also ordered the jury to continue deliberations. (T. 608). When the jury left the courtroom to continue deliberations, Hoyt's counsel said, "You didn't charge no inference." The court replied, "I sort of did." Hoyt's counsel objected that the court had failed to charge that the jury should not draw a "negative" inference from Hoyt's absence, and that the charge as given implied that Hoyt "voluntarily absented himself." The court declined to bring the jury back. (T. 608–10).

### D. *Verdict and Sentence*

Later that day, the jury found Hoyt guilty of one count of Criminal Sale of a Controlled Substance in the Third Degree and acquitted him of Criminal Possession of a Controlled Substance in the Third Degree. (T.611). He was sentenced as a second-felony offender to a term of five to ten years' imprisonment. (S.5–6).

### E. *Direct Appeal*

Hoyt filed a direct appeal through appointed counsel, arguing that (1) he had been deprived of his right to a public trial by (a) the trial court's partial closure of the courtroom during the testimony of the undercover officer, who had failed to articulate a particular fear justifying such a closure, and (b) the denial of access to the courtroom experienced by Hoyt's counsel's partner; and (2) Hoyt had been denied his right to the free exercise of religion under the First Amendment, and his right to be present at trial under the Sixth and Fourteenth Amendments, by the trial court's refusal to adjourn jury deliberations to permit Hoyt to observe the Muslim holy day. *See* Brief for Defendant–Appellant, dated Jan. 2003 (reproduced as Ex. A to Declaration in Opposition to Petition for a Writ of Habeas Corpus, filed Jan. 9, 2006 (Docket # 9) ("Opp.Decl.")), at 23–42.

Hoyt also filed a *pro se* supplemental brief. *See* Appellant's Supplemental Pro Se Brief, received July 16, 2003 (reproduced as Ex. B to Opp. Decl.). The State filed a brief in response. *See* Brief for Respondent, dated Oct. 2003 (reproduced as Ex. C to Opp. Decl.).

On December 11, 2003, the Appellate Division affirmed Hoyt's conviction. *See People v. Hall*, 2 A.D.3d 227, 769 N.Y.S.2d 28 (1st Dep't 2003). The court found that the record supported the trial court's decision to close the courtroom to the general public during the undercover officer's testimony, and that "[t]he record does not establish that … Hoyt's counsel's law partner was excluded from the courtroom in violation of the court's directive permitting him to enter." *Id.* at 227, 769 N.Y.S.2d 28 (citation omitted). The court also found that, although the trial court had not resolved the factual dispute regarding whether the partner had actually been excluded, Hoyt had "abandoned" the issue. *Id.* (citation omitted).

Finally, the Appellate Division found that the trial court had not violated Hoyt's right to the free exercise of religion or forced him to choose between two constitutional rights. *Id.* at 228, 769 N.Y.S.2d 28. The court stated that even though the jury was not sequestered, the trial court "had a compelling interest in completing the trial without a three-day hiatus in deliberations," and that the trial court's decision "was the least restrictive means of achieving that interest." *Id.* (citations omitted). The court added that the trial court "had offered to make a reasonable effort to arrange for Hoyt to attend services near the courthouse," and concluded that the court's instruction to the jury regarding Hoyt's absence had been appropriate. *Id.*

Hoyt submitted two letters to the New York Court of Appeals seeking leave to appeal the Appellate Division's ruling. *See*

Letters, dated Jan. 2, 2004, and Jan. 23, 2004 (reproduced as Ex. E to Opp. Decl.). The Court of Appeals denied Hoyt's application for leave to appeal on March 1, 2004. *See People v. Hoyt*, 2 N.Y.3d 741, 778 N.Y.S.2d 466, 810 N.E.2d 919 (2004).

### F. *The Instant Petition*

Hoyt timely submitted his habeas petition to this Court. *See* Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, filed May 24, 2005 (Docket # 2); Pet. Mem. He raises two claims: (1) that he was denied his right to a public trial where the court denied access to one of his counsel's partners during the testimony of the prosecution's main witness; and (2) that he was deprived of his constitutional right to the free exercise of religion when the court refused to adjourn the trial so that he could observe the Muslim holy day. *See* Pet. Mem. at 12–23. Respondent filed opposition papers, *see* Respondent's Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, filed Jan. 9, 2006 (Docket # 8) ("Resp.Mem."); Opp. Decl., and Hoyt filed reply papers, *see* Petitioner's Reply Memorandum of Law in Support of Petition for Writ of Habeas Corpus, dated Feb. 2, 2006 (Docket # 12) ("Pet. Reply Mem.").

## II. APPLICABLE LAW

### A. *Law Governing Habeas Corpus*

A petition for a writ of habeas corpus may not be granted with respect to any claim that has been "adjudicated on the merits" in the state courts unless the state court's adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

▪ For a claim to be adjudicated "on the merits" within the meaning of 28 U.S.C. § 2254(d), it must "finally resolv[e] the parties' claims, with res judicata effect," and it must be "based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) (internal quotation marks and citations omitted). As long as "there is nothing in its decision to indicate that the claims were decided on anything but substantive grounds," a state court decision will be considered to be "adjudicated on the merits" even if it fails to mention the federal claim and no relevant federal case law is cited. *Aparicio v. Artuz*, 269 F.3d 78, 94 (2d Cir.2001) (internal quotation marks omitted); *accord Rosa v. McCray*, 396 F.3d 210, 220 (2d Cir.2005) ("This standard of review applies whenever the state court has adjudicated the federal claim on the merits, regardless of whether the court has alluded to federal law in its decision.").

▪ In *Williams v. Taylor*, the Supreme Court held that a state court decision is "contrary to" clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). *Williams* also held that habeas relief is available under the "unreasonable application" clause only "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct.

1495. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411, 120 S.Ct. 1495. Rather, the state court's application must have been "objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495.

 In addition, under 28 U.S.C. § 2254(a), federal habeas review is available for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Errors of state law are not subject to federal habeas review. *See, e.g., Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). To be entitled to habeas relief a petitioner must demonstrate that the conviction resulted from a state court decision that violated federal law. *See, e.g., id.* at 68, 112 S.Ct. 475.

### B. *Procedural Default*

 Where a state court rejects a petitioner's claim because the petitioner failed to comply with a state procedural rule, the procedural default constitutes an adequate and independent ground for the state court decision. *See, e.g., Coleman v. Thompson,* 501 U.S. 722, 729–30, 749–50, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). A procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (citations omitted); *accord Dretke v. Haley,* 541 U.S. 386, 393, 124 S.Ct. 1847, 158 L.Ed.2d 659 (2004); *Coleman,* 501 U.S. at 749–50, 111 S.Ct. 2546; *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 809 (2d Cir.2000); *Bossett v.*

*Walker,* 41 F.3d 825, 829 (2d Cir.1994), cert. *denied,* 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995); see also *Harris,* 489 U.S. at 264 n. 10, 109 S.Ct. 1038 ("[A]s long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision," the adequate and independent state ground doctrine "curtails reconsideration of the federal issue on federal habeas.").

### III. *DISCUSSION*

#### A. *Right to a Public Trial*

Hoyt contends that his Sixth Amendment right to a public trial was violated when his trial counsel's law partner was denied access to the courtroom during the most critical phase of the hearing: the testimony of UC 1809, who was the prosecution's only witness to identify Hoyt as the seller of the drugs. *See* Pet. Mem. at 12–18.

#### 1. *Procedural Default*

The Appellate Division held that "[t]he record does not establish that defendant Hoyt's counsel's law partner was excluded from the courtroom in violation of the court's directive permitting him to enter," and that although "the court never resolved the parties' factual dispute as to whether or not this actually occurred, Hoyt abandoned the issue." 2 A.D.3d at 227, 769 N.Y.S.2d 28 (citing *People v. Kinchen,* 60 N.Y.2d 772, 469 N.Y.S.2d 680, 457 N.E.2d 786 (1983); *People v. Graves,* 85 N.Y.2d 1024, 1027, 630 N.Y.S.2d 972, 654 N.E.2d 1220 (1995)). Respondent argues that this holding constitutes a procedural bar to Hoyt's public trial claim, and thus prevents habeas review because it constitutes an independent and adequate state ground for denial of the claim. *See* Resp. Mem. at 14–19. In his original memorandum, Hoyt argued that the Appellate Division "failed to adjudicate the issue on the

merits," because it made an "unreasonable determination that petitioner abandoned the issue." *See* Pet. Mem. at 12. In his reply brief, however, Hoyt argues that the Appellate Division "actually addressed the merits of petitioner's claim," because a) it found that the record did not establish that the partner was excluded, b) it never stated that Hoyt had failed to comply with New York Criminal Procedure Law ("CPL") § 470.05(2) or that he had failed to preserve his claim for review, and c) it never stated that it was avoiding review of the merits because of the purported abandonment. *See* Pet. Reply Mem. at 2.

■ Contrary to the argument made by Petitioner in his reply brief, it is clear that the Appellate Division rejected the claim not on the merits but for a procedural reason-specifically, because "Hoyt abandoned the issue," 2 A.D.3d at 227, 769 N.Y.S.2d 28. This statement cannot reasonably be read to constitute anything other than reliance on a procedural bar. This conclusion is buttressed by the authority the Appellate Division cited for this statement: *Graves*, 85 N.Y.2d at 1027, 630 N.Y.S.2d 972, 654 N.E.2d 1220, which held that a defendant had "abandoned" a claim because the claim had not been mentioned during the questioning of a particular witness relevant to the claim. *Graves* in turn cited *People v. Rogelio*, 79 N.Y.2d 843, 580 N.Y.S.2d 185, 588 N.E.2d 83 (1992), to support its ruling-a case that had specifically noted a defendant's failure to make "an unambiguous objection" to an issue and that had therefore concluded that the defendant had not "preserved the issue for appellate review." *Id.* at 844, 580 N.Y.S.2d 185, 588 N.E.2d 83. This latter

statement is an obvious reference to CPL § 470.05(2), which codifies New York's contemporaneous objection rule.[2]

Because the Court of Appeals denied Hoyt leave to appeal the Appellate Division's ruling, that ruling is the "last reasoned opinion" in this case. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (where "the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits").

■ The Appellate Division's ruling constituted an "independent" state law ground for the decision because its rejection of Hoyt's claim as "abandoned" was based on a procedural failure. *See generally Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir.1999) (reliance on a procedural bar "constitutes an 'independent' state ground") (citing *Harris*, 489 U.S. at 263, 109 S.Ct. 1038). The remaining question is "whether the state ground relied upon is 'adequate' to preclude federal habeas review." *Id.* at 77. "[A] procedural bar will be deemed 'adequate' only if it is based on a rule that is 'firmly established and regularly followed' by the state in question." *Id.* (quoting *Ford v. Georgia*, 498 U.S. 411, 423–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991)).

■ Whether application of the procedural rule is "firmly established and regularly followed" must be judged in the context of "the specific circumstances presented in the case, an inquiry that includes an evaluation of the asserted state interest in applying the procedural rule in

---

**2.** The Appellate Division's citation to *Kinchen*, 60 N.Y.2d 772, 469 N.Y.S.2d 680, 457 N.E.2d 786, does not alter the conclusion that the Court was applying a procedural bar. In *Kinchen*, the Court of Appeals had held that a claim could not be properly considered where there was no proof in the record with regard

to the defendant's allegations. *See* 60 N.Y.2d at 774, 469 N.Y.S.2d 680, 457 N.E.2d 786. Here, Hoyt made a detailed proffer (which was corroborated in part by the prosecution) but was never permitted to make any further record despite his repeated offers to do so.

such circumstances." *Cotto v. Herbert,* 331 F.3d 217, 240 (2d Cir.2003) (citing *Lee v. Kemna,* 534 U.S. 362, 386–87, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002)). The Second Circuit has set forth the following "guideposts" for making this determination: (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Id.* (citing *Lee,* 534 U.S. at 381–85, 122 S.Ct. 877).

The *Cotto* factors, however, are not relevant here because the problem with the Appellate Division's ruling is not that it held Hoyt to some overly rigorous application of a procedural rule. Rather, the problem is that the Appellate Division's invocation of the procedural bar relies on a factual determination that is completely unsupported by the trial record: namely, that Hoyt had "abandoned" his *Hinton* claim. In fact, Hoyt raised the issue, moved for a mistrial, and twice offered to amplify the record with testimony from the attorney who was excluded from the courtroom. *See* T. 455, 456, 606. The habeas corpus statute provides that a factual determination by the state court "shall be presumed to be correct," but that a petitioner may rebut that presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Here, the record itself constitutes "clear and convincing evidence" that Hoyt never "abandoned" his claim.

Respondent asserts that there is a rule that required Hoyt to "maintain his objection" to the *Hinton* violation and that Hoyt failed to do so after the prosecutor later argued that his attorney's colleague had voluntarily chosen not to enter the courtroom. *See* Resp. Mem. at 17 (citing Tr. 605–06). But under CPL § 470.05(2), "an issue of law is preserved even if it is not specifically raised by the defendant so long as the trial court expressly rules on the issue following an earlier objection." *Cotto,* 331 F.3d at 244 (citing *People v. Edwards,* 95 N.Y.2d 486, 719 N.Y.S.2d 202, 741 N.E.2d 876 (2000)). *See also id.* at 244–45 (citing cases in New York intermediate appellate courts). That is precisely what occurred here. Moreover, even during this later conversation, Hoyt's counsel again offered to produce his colleague to testify at a "fact finding hearing" that he was in fact denied entry. (Tr. 606).

■ The cases respondent cites provide no support for the contention that Hoyt abandoned his claim inasmuch as these cases involved instances where the defendant did not make his objections clear to the trial judge. *See People v. Lora,* 298 A.D.2d 149, 150, 748 N.Y.S.2d 8 (1st Dep't 2002) (defendant abandoned challenge where, even though he successfully sought to exclude certain evidence and alluded to concerns about other evidence, he "conceded the propriety of admitting some such evidence, never articulated any objection to the specific evidence challenged on appeal, and never objected when the specific evidence was admitted") (citation omitted); *People v. Dockery,* 272 A.D.2d 247, 248, 708 N.Y.S.2d 620 (1st Dep't 2000) (defendant abandoned claim that court failed to grant request for a particular charge where, "after the court tentatively agreed that such charge would be appropriate but expressed a desire to mull over the prosecutor's objections,

there was no further discussion of the matter and defendant expressed no dissatisfaction with the charge") (citations omitted). These cases are of no relevance because, under New York law, "once a party has made his position known to the court, 'the law does not require [him] to make repeated pointless protests' after the court has ruled." *Cotto*, 331 F.3d at 247 (citing *People v. Mezon*, 80 N.Y.2d 155, 161, 589 N.Y.S.2d 838, 603 N.E.2d 943 (1992)).[3]

### 2. *The Merits of the Claim*

Given that the state court did not reach the merits of the claim, the next question becomes the standard by which the decision should be reviewed: *de novo* or based on the deferential standard contained in 28 U.S.C. § 2254(d). Because Hoyt's claim fails under the less deferential *de novo* standard of review, we need not reach this issue.

■■■ The Sixth Amendment requires that "in all criminal prosecutions, the accused shall enjoy the right to a ... public trial." U.S. Const., Amend. VI. The purpose of a public trial "is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Waller v. Georgia*, 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (quoting *In re Oliver*, 333 U.S. 257, 270 n. 25, 68 S.Ct. 499, 92 L.Ed. 682 (1948) (internal quotation marks omitted)). A violation of the right to a public trial is a "structural error"-that is, a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself," see *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)-and such errors "warrant[ ] remediation regardless of prejudice." *Sevencan v. Herbert*, 342 F.3d 69, 74 (2d Cir.2003), *cert. denied*, 540 U.S. 1197, 124 S.Ct. 1453, 158 L.Ed.2d 111 (2004). Nonetheless, "this does not mean that the Sixth Amendment is violated every time the public is excluded from a courtroom.... [E]ven an unjustified closure may, on its facts, be so trivial as not to violate the charter." *Peterson v. Williams*, 85 F.3d 39, 40 (2d Cir.), *cert. denied*, 519 U.S. 878, 117 S.Ct. 202, 136 L.Ed.2d 138 (1996).

■■■ A courtroom closure is typically justified by reference to the four-factor test enunciated in *Waller*, 467 U.S. at 48, 104 S.Ct. 2210. In *Waller*, the Supreme Court held that "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced; the closure must be no broader than necessary to protect that interest; the trial court must consider reasonable alternatives to closing the proceeding; and it must make findings adequate to support the closure." *Waller*, 467 U.S. at 48, 104 S.Ct. 2210; *accord Brown v. Kuhlmann*, 142 F.3d 529, 537 (2d Cir.1998).

■■■ In this case, however, the applicability of the *Waller* factors is not at issue. The trial court conducted a hearing regarding the partial courtroom closure dur-

---

3. Reflecting the poverty of her position, respondent also cites without explanation two cases that merely note that a defendant had "abandoned" a claim-without discussing at all the factual circumstances underlying the abandonment. *See People v. Williams*, 269 A.D.2d 230, 231, 704 N.Y.S.2d 207 (1st Dep't 2000) ("fair reading of the record" establishes that defendant abandoned attempts to introduce evidence that police recovered two firearms in addition to weapon with whose possession defendant was charged); *People v. Martinez*, 304 A.D.2d 386, 387, 756 N.Y.S.2d 751 (1st Dep't 2003) (no facts given as to how defendant "abandoned" his request).

ing UC 1809's testimony, *see* H. 1–37, and made findings on which the granting of that closure was based. Hoyt does not now challenge the propriety of those findings or of that closure. Thus, we are called upon to consider only whether the inadvertent violation of the trial court's closure order implicates the Sixth Amendment. For purposes of this analysis, we assume that counsel's partner was excluded from the courtroom for the entirety of the undercover officer's testimony and that this exclusion took place in direct contravention of the trial judge's order.

The Second Circuit has considered under what circumstances a courtroom closure, even though "unjustified," may nevertheless be too "insignificant" or "trivial" to implicate the Sixth Amendment right to a public trial. *See Peterson,* 85 F.3d at 40–41. In *Peterson,* the trial judge had ordered the closure of the courtroom during the testimony of an undercover officer in a drug sale case. While the courtroom was supposed to be re-opened following that testimony, it remained closed and thus was closed when the defendant took his stand in his defense. It remained closed during the entirety of the defendant's testimony, which lasted about 20 minutes. Peterson sought a writ of habeas corpus, challenging not the initial closure but the continued, inadvertent closure that occurred during his own testimony.

*Peterson* reversed the district court's grant of a writ of habeas corpus. To determine whether there had been a Sixth Amendment violation, it adverted to the four "values furthered by the public trial guarantee." 85 F.3d at 43. These are: "1) to ensure a fair trial; 2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; 3) to encourage witnesses to come forward; and 4) to discourage perjury." *Id.* (citing *Waller,* 467 U.S. at 46–47, 104 S.Ct. 2210); *accord United*

*States v. Smith,* 426 F.3d 567, 572 (2d Cir.2005). The court stated that the first, second, and fourth values were "hardly in issue in this case given the brevity and inadvertence of the closure. (For example, since the defendant did not know of the closure and he was the only one to have testified during it, the closure was most unlikely to have encouraged perjury.)" 85 F.3d at 43. The court acknowledged that the third reason, encouraging witnesses to come forward and confirm or reject the testimony offered during closure, "might have been somewhat implicated." *Id.* at 43–44. Nevertheless, it found, "the repetition, in the summation, of the defendant's brief testimony could well have served to give notice to some potential corroborating witnesses." *Id.* at 44. In sum, the court held that while no specific circumstance of this case necessarily negated the defendant's Sixth Amendment claim, "in the context of this case, where the closure was 1) extremely short; 2) followed by a helpful summation; and 3) entirely inadvertent, the defendant's Sixth Amendment rights were not breached." *Peterson,* 85 F.3d at 44.

Since *Peterson,* the Second Circuit has "extended" the *Peterson* "triviality analysis" to a case that-unlike Hoyt's-involved a deliberate closure. Thus, *Carson v. Fischer,* 421 F.3d 83 (2d Cir.2005), found that a deliberate courtroom closure during a police officer's testimony was " 'not substantial enough to undermine the values furthered by the public trial guarantee' because the officer's testimony was cumulative of other witnesses' testimony, it concerned a collateral issue, and transcripts of the trial were publicly available." *Id.* at 92 (quoting *Brown,* 142 F.3d at 534, 544))); *see also Bowden v. Keane,* 237 F.3d 125, 129 (2d Cir.2001) ("in certain circumstances a court may order its doors closed for a non-trivial period-and over a defendant's objection-without violating the

Constitution."). Similarly, other circuits have considered the four values articulated in *Peterson* even where a closure was deliberate. *See, e.g., United States v. Ivester,* 316 F.3d 955, 959–60 (9th Cir.2003) (applying the "wise and widely-accepted *Peterson* test" to find no Sixth Amendment violation where courtroom was briefly closed during questioning of jurors to determine whether they felt safe, and closure did not infect any witness testimony or opening or closing arguments); *United States v. Shryock,* 342 F.3d 948, 974–75 (9th Cir.2003) (no Sixth Amendment violation when seating limited by size of courtroom), *cert. denied,* 541 U.S. 965, 124 S.Ct. 1729, 158 L.Ed.2d 411 (2004); *Braun v. Powell,* 227 F.3d 908, 919 (7th Cir.2000) (deliberate exclusion of a venireperson from the trial did not implicate the right to a public trial).

■ We now turn to an application of the four *Peterson* values to Hoyt's case. With regard to the first value-to insure a fair trial-Hoyt argues that his attorney's partner was denied entry during "the People's most critical witness," and that a "defendant facing a significant prison sentence would surely appreciate the expertise of an additional attorney during the testimony" of such a witness. *See* Pet. Reply Mem. at 4. But Hoyt, who is represented, has submitted nothing to this Court that provides anything other than speculation on this score. Hoyt's counsel never suggested that the other attorney was assisting in Hoyt's defense, or that counsel was prevented from using as he wished the photographs his partner was delivering. Nor has Hoyt pointed to anything during the undercover's testimony that his counsel did not notice but that might have been noticed by another attorney. Hoyt's citation to *Bobb v. Senkowski,* 196 F.3d 350 (2d Cir.1999), *see* Pet. Reply Mem. at 4, is of no relevance since that case involved a *Waller* analysis and thus required consideration of the significance of the witness whose testimony would be the subject of closure. *See* 196 F.3d at 353–54. Here, Hoyt does not challenge the permissibility of the courtroom closure itself. Moreover, "[t]he improper exclusion of the public from the courtroom during the testimony of a single witness, even a witness crucial to the case against the defendant, generally does not 'risk[ ] an unreliable trial outcome and the consequent conviction of an innocent person.' "*Nieblas v. Smith,* 204 F.3d 29, 32 (2d Cir.1999) (quoting *Kuhlmann,* 142 F.3d at 539) (quoting *O'Neal v. McAninch,* 513 U.S. 432, 442, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (internal quotation marks omitted)). Notably, the undercover officer's testimony was summarized in the closing arguments of the prosecutor, *see* T. 508–29-a circumstance mentioned prominently in *Peterson* as lessening the significance of a closure. *See* 85 F.3d at 44.

The second value-to remind the prosecutor and judge of their responsibility to the accused and of the importance of their functions-was also not undermined by the exclusion here, since neither party had any reason to know that Hoyt's attorney's colleague had been excluded and also because the exclusion was only for a portion of the trial. *See Peterson,* 85 F.3d at 43 (first, second, and fourth values not implicated because of brevity and inadvertence of closure).

The third value-to encourage witnesses to come forward-was not implicated because it appears that no potential witnesses were excluded from the courtroom. In any event, as was true in *Peterson,* the "repetition, in the summation" of the testimony of the undercover officer "could well have served to give notice to some potential corroborating witnesses." *See* 85 F.3d at 44.

The fourth value-to discourage perjury-was similarly not implicated. There is no

indication that the undercover officer had any idea that any spectator had been improperly excluded from the courtroom. *See Peterson*, 85 F.3d at 43 (where, *inter alia*, "the defendant did not know of the closure," the closure was "most unlikely to have encouraged perjury"). In addition, had Hoyt's counsel's colleague entered, there is no reason to believe that the existence of this additional spectator would have had any greater effect in deterring perjury on the part of the officer.

In sum, none of the values underlying the fair trial right can reliably be said to have been implicated by the inadvertent closure in this matter, and thus Hoyt's Sixth Amendment right was not violated. This result is in accord with other case law. The Tenth Circuit has stated the broad rule that the denial of the public trial right "requires some affirmative act by the trial court meant to exclude persons from the courtroom." *United States v. Al–Smadi*, 15 F.3d 153, 154–55 (10th Cir. 1994) (upholding conviction where there was a 20–minute courtroom closure preventing defendant's wife and child from entering that was "unnoticed by any of the trial participants"); *see also Snyder v. Coiner*, 510 F.2d 224, 230 (4th Cir.1975) (bailiff's erroneous refusal to allow persons to enter or leave the courtroom for a brief

time during closing arguments deemed "too trivial to amount to a constitutional deprivation").[4]

### B. Hoyt's Claim Regarding His Absence from the Courtroom

#### 1. Free Exercise Clause

Hoyt claims that the trial court violated his First Amendment right to the free exercise of religion when it refused to adjourn jury deliberations on a Friday, thus forcing him as a Muslim to choose between attending religious services and being present at his trial. See Pet. Mem. at 19–23; Pet. Reply Mem. at 6–7. He further claims that the court "exacerbated the error"-and failed to reduce the risk of prejudice-by giving a jury charge concerning Hoyt's absence that "implied that [Hoyt] voluntarily absented himself and was not present by his own choice." See Pet. Mem. at 23. The Appellate Division decided this claim as follows:

■ The court did not violate defendant Hoyt's right to the free exercise of his religion, and did not force him to choose between that right and his right to be present at trial. The jury was charged on a Thursday, and the court properly refused to suspend deliberations until the

---

4. While neither party has argued that the case of *Gonzalez v. Quinones*, 211 F.3d 735 (2d Cir.2000), has any relevance, the Court notes that it is inapplicable here. In *Gonzalez*, the parties had agreed that, during an undercover officer's testimony, the courtroom entrance would be guarded by a court officer; that defendant's family members and defense counsel's colleagues would be permitted to enter; and that the court would hold a *Hinton* hearing only if someone else attempted to enter the courtroom. *See id.* at 736. Instead, due to a misunderstanding, the courtroom entrance was locked and left unattended. During that time, three colleagues of defense counsel attempted unsuccessfully to enter the courtroom. In a habeas proceeding, the petitioner in *Gonzalez* challenged the propriety of

the closure itself and, because the trial court had not held a hearing on that issue, the Second Circuit remanded the case for such a hearing. In so doing, the court noted that "[h]ad the customary hearing been held on the People's application for closure, and had the trial judge made a properly supported finding of an 'overriding interest that is likely to be prejudiced,' the courtroom would have been closed during the testimony of the undercover officer, by the trial judge's intentional lawful action, rather than as the result of the misunderstanding that occurred." *Gonzalez*, 211 F.3d at 738 (citation omitted). Here, the trial court held a *Hinton* hearing, *see* H. 1–37, and determined that partial closure was justified-a determination that is not being challenged.

following Monday so that Hoyt could attend religious services on Friday. Although the jury was not sequestered, the court had a compelling interest in completing the trial without a three-day hiatus in deliberations, and its ruling was the least restrictive means of achieving that interest. Moreover, the court offered to make a reasonable effort to arrange for Hoyt to attend services near the courthouse if he came to court on Friday. The record is clear that Hoyt understood on Thursday night that the proceedings would continue the next day, and that he voluntarily chose not to come to court on Friday. The court's instruction to the jury concerning Hoyt's absence was appropriate.

*Hall*, 2 A.D.3d at 228, 769 N.Y.S.2d 28 (citations omitted). Because this determination was "on the merits," it is afforded the deferential standard of review discussed in section II.A. above.

In his petition, Hoyt persists in asserting that his claim arises under the Free Exercise Clause of the First Amendment and not under any other constitutional guarantee. *See* Pet. Mem. at 19–23. He does not cite any Supreme Court law, however, that permits the overturning of a criminal conviction based on a Free Exercise violation that occurs during the course of a criminal trial. Moreover, as respondent points out, *see* Resp. Mem. at 26, Hoyt in fact was able to attend the Friday services and obviously has no claim charging that he was unable to do so. Thus, to the extent Hoyt's claim is grounded solely on the Free Exercise Clause, it must fail.

Nonetheless, this Court will not end its consideration of Hoyt's claim solely because of his choice to categorize it so narrowly. In her opposition brief, respondent pointed to the case of *Morgan v. Walsh*, 2002 U.S. Dist. LEXIS 26734 (S.D.N.Y. Nov. 27, 2002), *adopted* by, 2003 WL 22019835, 2003 U.S. Dist. LEXIS 14813 (S.D.N.Y. Aug. 27, 2003), which similarly involved a defendant who failed to appear on a Friday during jury deliberations and who asserted a First Amendment violation. The *Morgan* court re-characterized petitioner's First Amendment claim as one instead asserting that he had not voluntarily waived his right to be present at his trial. *Id.* at *20 & n. 6. While Hoyt in his reply brief to this Court did not seek to recharacterize his claim, he did make the effort to distinguish *Morgan* on its facts. Although Hoyt's claim fails under the Free Exercise Clause alone, the Court will examine whether there could have been any merit to Hoyt's claim had it been characterized as grounded in Hoyt's right to be present at trial. This is particularly appropriate since, as described below, it is necessary to consider case law governing the Free Exercise Clause in determining the contours of Hoyt's right to be present at trial.

### 2. *Right to Be Present at Trial*

As the Second Circuit has held, "[i]t is a well-settled principle of constitutional law that a criminal defendant has the right 'to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings.'" *Cohen v. Senkowski*, 290 F.3d 485, 489 (2d Cir. 2002), cert. *denied*, 537 U.S. 1117, 123 S.Ct. 879, 154 L.Ed.2d 794 (2003) (quoting *Faretta v. California*, 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and citing *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987)). The right is derived from both the Sixth Amendment's Confrontation Clause and from the common law. *United States v. Fontanez*, 878 F.2d 33, 35 (2d Cir.1989) (citing cases). However, it is equally well-established that a defendant may waive this right knowingly and voluntarily, see *Diaz v. United States*, 223 U.S. 442, 456–58, 32 S.Ct. 250, 56 L.Ed. 500 (1912); *United States v. Hernandez*, 873

F.2d 516, 518 (2d Cir.1989). In addition, a waiver may be inferred from a defendant's conduct. *See United States v. Gagnon,* 470 U.S. 522, 528–29, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985); *Cohen v. Senkowski,* 290 F.3d at 491–92.

Here, there can be no question that Hoyt's waiver was "knowing." After all, the trial judge stated in Hoyt's presence that deliberations would continue on Friday, and that a verdict would be taken "whether the defendant is here or not." *See* T. 591. Thus, Hoyt plainly knew what the consequences would be of his failure to appear in court.

Rather, we believe, as did the court in *Morgan,* that the critical issue here is to determine whether Hoyt's choice to absent himself from court was truly "voluntary." *Morgan* held that a defendant's "intent" is the "critical factor in determining voluntariness." *Morgan,* 2002 U.S. Dist. LEXIS 26734, at *28. Indeed, in the typical case, intent can be the hallmark of voluntariness. *See, e.g., United States v. Tortora,* 464 F.2d 1202, 1208 (2d Cir.1972) ("A defendant who deliberately fails to appear in court does so voluntarily."). Thus, case law is replete with instances that seem to turn on this distinction. *Compare Taylor v. United States,* 414 U.S. 17, 20, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973) (voluntary waiver where defendant failed to return to trial and fled after lunch recess); *Smith v. Mann,* 173 F.3d 73, 77 (2d Cir.1999), cert. denied, 528 U.S. 884, 120 S.Ct. 200, 145 L.Ed.2d 168 (1999) (voluntary waiver where defendant overslept and missed the beginning of his trial, then failed to report to court after he woke up); *United States v. Nichols,* 56 F.3d 403, 416 (2d Cir.1995) (voluntary waiver where "[the defendant] chose of his own volition to remain in his holding cell throughout most of the trial"), *with United States v. Mackey,* 915 F.2d 69, 73–74 (2d Cir.1990) (no waiver where defendant absent for first day of trial due to

transportation difficulties about which he had informed the court); *Fontanez,* 878 F.2d at 36–37 (no waiver where defendant failed to appear in court because he was taken into police custody in connection with an unrelated crime).

Here, Hoyt obviously "intended" not to go to court inasmuch as he was unquestionably capable of complying with the arrangements that had been made to bring him there and chose not to do so. Thus, there may be some surface appeal to the argument that his "intention" not to go to court means that his decision to do was necessarily "voluntary." On the other hand, acts that are "intentional" may not necessarily be "voluntary" for legal purposes. For example, case law arising under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), recognizes that a statement of a suspect is not "voluntary" if the suspect's relinquishment of rights under *Miranda* was the product of "coercion." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). This rule plainly holds true even for statements that are "intentionally" made.

The question of whether a choice is voluntary-in the sense of having been made free of coercion-should have the same force in the context of this Sixth Amendment claim. This principle has been recognized in at least one New York State case. In *People v. Gilliam,* 215 A.D.2d 401, 626 N.Y.S.2d 245 (2d Dep't 1995), the Appellate Division found that a trial judge had been unjustified in refusing to adjourn court so that the defendant could observe a Friday Sabbath. In reversing the conviction, *Gilliam* held that "the trial court impermissibly forced the defendant to choose between his First Amendment right to the free exercise of his religion and his right to be present at the voir dire." *Id.* at 402, 626 N.Y.S.2d 245. The

court thus concluded that "his waiver [of his right to appear] was not voluntary." *Id.*

■ This Court believes that the doctrine articulated in *Gilliam* represents a proper analysis of Hoyt's claim. In other words, the issue of the voluntariness of a defendant's decision to absent himself from court proceedings due to religious observance must be tied to the question of whether the First Amendment requires a trial judge to accede to the defendant's desire to engage in the particular exercise of his religion. To frame the issue in terms of the Sixth Amendment's "voluntariness" requirement: if a criminal defendant had a First Amendment right to be excused from attending trial on a particular day, a judge's insistence on convening trial on that day would amount to the sort of "coercion" that would render involuntary the defendant's otherwise intentional decision to absent himself.

Accordingly, we now turn to an examination of whether the Free Exercise Clause granted Hoyt the right to attend religious services rather than his trial on the day in question.

■ "The Free Exercise Clause of the First Amendment, which has been applied to the states through the Fourteenth Amendment, provides that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'" *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574–75 (2d Cir.2002) (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993)) (internal quotation marks omitted). Nonetheless, "[n]ot all

burdens on religion are unconstitutional.... The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest." *Bob Jones University v. United States*, 461 U.S. 574, 603, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983) (citations omitted). The governmental interest must be "compelling" and there must be no "less restrictive means ... available to achieve" it. *Id.* at 604, 103 S.Ct. 2017 (citations and internal quotation marks omitted).[5]

The only reported federal case (other than *Morgan*) of which this Court is aware that appears to have squarely considered the question of adjourning a trial based on a defendant's need to engage in religious observance is *United States v. Fisher*, 571 F.Supp. 1236, 1241 (S.D.N.Y. 1983). In *Fisher*, the court considered the request of one of eight co-defendants that trial be adjourned on Fridays so that he could attend Muslim services. *See id.* at 1237. The court noted that while the request was made two weeks prior to the start of the trial, the defendant had not previously requested Fridays off, and had been present on four of the previous eleven Fridays during which pretrial proceedings took place. *See id.* Furthermore, the court noted, there were no objections when it had previously announced a five-day-a-week trial schedule. *See id.* The court denied the request because there were a large number of co-defendants and because of the possibility that the case could "last weeks, or perhaps months." *See id.* at 1241. Given this, "[t]he removal of one-fifth of the time available to try this case each week could add two weeks, or more, to the length of the trial." *See id.*

---

5. While it is not relevant here, the Supreme Court had at one time applied a less restrictive test to prohibitions on religious observance of general applicability. *See Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 882, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). That test was ultimately supplanted by the mandates of the Religious Land Use and Institutionalized Persons Act of 2000, codified at 42 U.S.C. §§ 2000cc *et seq.*

Thus the court found "a legitimate and compelling judicial interest-one based on both efficiency and fairness to all concerned-in using all available days of the week for trial of this case." *See id.* Furthermore, the court found that "there is no less restrictive alternative by which it can serve this interest and at the same time accommodate [the defendant's] religious beliefs." *See id.*

A number of New York state cases have similarly considered such requests and decided them with reference to the First Amendment. For example, in *People v. Johnson*, 295 A.D.2d 106, 743 N.Y.S.2d 434 (1st Dep't 2002), the court upheld the denial of an adjournment request where the defendant did not make the request until Friday morning, the apparently unsequestered jury was deliberating, and the court foresaw problems with continuing deliberations on the Monday. The Court concluded that "a three-day adjournment would have substantially jeopardized the State's compelling interest in insuring a fair trial for both defendant and the People." *Id.* at 107, 743 N.Y.S.2d 434. Similarly, in *People v. Rosemond*, 270 A.D.2d 293, 704 N.Y.S.2d 111 (2d Dep't 2000), the court found no violation of the First Amendment where the day at issue occurred when the sequestered jury was in its second day of deliberations, and concluded that the trial judge had a "legitimate and compelling State interest in completing the trial without further sequestration of the jury over the weekend." *Id.* at 293, 704 N.Y.S.2d 111; *accord People v. Williams*, 197 A.D.2d 401, 401, 602 N.Y.S.2d 377 (1st Dep't 1993) (citing *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), to find proper denial of adjournment request where jury had already been sequestered for two days, and defendant offered no less restrictive proposition to the court). In *Gilliam*, however, the court reversed a conviction where the defendant was a Muslim minister who celebrated the

Sabbath on Friday, and was scheduled to lead prison services on that day. The trial was not at the deliberations stage but rather at the *voir dire* stage, and the court found that trial schedule "could have been adjusted to accommodate the defendant." 215 A.D.2d at 402, 626 N.Y.S.2d 245. The court concluded that "the defendant's request for an adjournment to attend religious services was improperly denied in that no compelling State interest was shown." *Id.*

In Hoyt's case, the trial judge denied the request largely on the ground that "to the extent that people are out there for three days, [that] increases the possibility that somebody will get sick, get injured, have a family tragedy," and thus that "it just exacerbates the possibility of a retrial." (T. 599); *see also* T. 603 (adjournment would cause the court to "lose control" of the jury, and "the [S]tate's interest in getting a verdict surpasses the defendant's right to be present at his verdict."). The court also noted that the trial had already been delayed by a day due to the illness of the undercover officer and that this was the second trial of Hoyt and Hall, which "further exacerbates the circumstances and lingers [sic] the [S]tate[']s desire to have a resolution of this." (T. 589). The court reasoned that "[t]o send these jurors out into the community at this juncture, doesn't satisfy the [S]tate[']s needs." (T. 590).

Certainly, there are factual differences between Hoyt's case and some other cases upholding a refusal to adjourn proceedings to permit a Sabbath observance. In *Johnson* the request was not made until the Friday morning of deliberations. 295 A.D.2d at 106, 743 N.Y.S.2d 434. In *Rosemond*, the jury was sequestered. 270 A.D.2d at 293, 704 N.Y.S.2d 111. But these differences do not suggest that the Appellate Division's ruling in Hoyt's case

represented an "unreasonable application" of Supreme Court law. There is a compelling government interest in declining to interrupt jury deliberations, particularly given the approach of a weekend. Thus, the trial judge could properly conclude that the need to continue deliberations "outweigh[ed] the very precious and obviously sensitive right of a person to exercise his or her religion." *See* T. 590. Notably, the trial court made an effort to accommodate Hoyt's religious practices by offering to "make phone calls and make efforts ... to have him produced across the street for a Muslim service," although the judge made clear that he could not guarantee that Hoyt would be able to attend these services. (T. 594).

 Finally, there is no merit to Hoyt's claim that the trial court's explanation to the jury of Hoyt's absence improperly "implied that petitioner voluntarily absented himself and was not present by his own choice." Pet. Mem. at 23. To sustain a claim that a jury instruction was improper, a petitioner must show "not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973) (citations omitted); *accord Davis v. Strack,* 270 F.3d 111, 123 (2d Cir.2001). For an erroneous jury charge to result in a conviction that violates federal due process, the error must be one that "infected the entire trial." *Cupp,* 414 U.S. at 147, 94 S.Ct. 396; *accord Blazic v. Henderson,* 900 F.2d 534, 541 (2d Cir.1990). Here, the trial judge's statement that Hoyt had "a right not to be here" and that the jury "should not draw any inference from his not being here," (T. 607), was entirely accurate and within the bounds of the Due Process Clause.

In sum, Hoyt's second claim does not warrant habeas relief.

*Conclusion*

For the foregoing reasons, Hoyt's petition should be denied.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. See also Fed.R.Civ.P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Jed S. Rakoff at 500 Pearl Street, New York, New York 10007, and to the undersigned at 40 Centre Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Rakoff. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140, 144–45, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).